John Elvis ROGERS, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 1997–SC–0851–MR.

Supreme Court of Kentucky.

Sept. 26, 2002.

As Modified Oct. 3, 2002.

Daniel T. Goyette, Frank William Heft, Jr., Jefferson District Public Defender, Louisville, Counsel for Appellant.

A.B. Chandler, III, Attorney General, Gregory C. Fuchs, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

KELLER, Justice.

## I. INTRODUCTION

A Jefferson Circuit Court jury found Appellant guilty of Murder, First–Degree Robbery, and First–Degree Burglary, and recommended that Appellant serve concurrent prison sentences totaling thirty (30) years. The trial court entered judgment in accordance with the jury's verdict, and Appellant thus appeals to this Court as a matter-of-right.[1] After oral argument and a review of the record, we reverse the judgment of the Jefferson Circuit Court and remand this case for a new trial because the trial court erred when it: (1) prohibited Appellant from introducing evidence concerning the circumstances under which Appellant made his incriminating statements; and (2) failed to instruct the jury as to the law of voluntary intoxication and lesser-included criminal homicide offenses justified by the evidence.

## II. FACTUAL BACKGROUND

On March 17, 1995, Mark Buchter ("Buchter") was found bludgeoned to death in his home in the Portland area of Louisville. An autopsy revealed that Buchter: (1) died as a result of blunt force cranial injuries suffered when he was struck on the back of his head eighteen (18) times with a blunt instrument of linear composition; (2) was also stabbed several times, most likely with the same instrument; and (3) had defensive wounds on his hands and arms.

---

1. KY. CONST. § 110(2)(b).

Following an investigation by the Louisville Police Department, a Jefferson County Grand Jury returned an indictment charging Appellant with Murder, First–Degree Robbery, and First–Degree Burglary. Appellant entered a plea of not guilty to the indicted offenses, and the matter was tried before a jury.[2] At trial, the Commonwealth introduced no physical evidence linking Appellant to the crime scene, and relied upon Appellant's confession to Louisville Police Department officers and separate incriminating statements allegedly made by Appellant to Rhonda Anderson ("Anderson") and her daughter, Wendy. Although Appellant did not testify at trial, he defended against the charges by arguing, that: (1) he falsely confessed to involvement in the crimes only because he, a mentally-retarded eighteen (18) year old, was overwhelmed by the interrogation process and wished to please the authority figures who were performing the interrogation; (2) the other evidence in the case contradicted the details of Appellant's confession, suggesting that Appellant had been coached; (3) Anderson was untruthful when she testified that Appellant admitted his involvement in the crimes; and (4) Appellant was at home, asleep in his bed with his wife, when these crimes occurred.

At trial, Anderson testified that she overheard Appellant tell her daughter not to worry because "They'll never find out who did it." According to Anderson, when she asked Appellant what he was talking about, Appellant told her that: (1) he and three (3) others—Jason Lewis ("Lewis"), Mary Beth Stocking (Lewis's girlfriend), and Rickie Montgomery ("Montgomery") robbed Buchter, but did not mean to kill him; (2) the robbery got out of hand when

Buchter began screaming and Appellant then began hitting Buchter with a lug-wrench; (3) Montgomery, Lewis, and another person (described as a "black guy") also began hitting Buchter; and (4) they then ran out of the house, down an alley, and Appellant threw the wrench away. Anderson testified that Montgomery, Mike Meredith ("Meredith"), and Brandy Harris ("Harris") were present when Appellant made these statements to her. Anderson's daughter corroborated her mother's statement at trial by testifying that she overheard Appellant's incriminating statements to her mother and that Meredith, Harris, and some other people were also present at the time.

Although the investigating officers had spoken with Appellant earlier in the investigation and Appellant had denied any knowledge of the crimes, Detective Gary Kearney ("Det. Kearney") decided to speak with Appellant again after Anderson implicated Appellant in Buchter's death. On the evening of April 4, 1995, Det. Kearney caught up with Appellant and Appellant agreed to accompany Det. Kearney to the police station. There, Appellant agreed to take a polygraph examination administered by Lieutenant Eddie Payton ("Lt. Payton"). During the examination, Appellant again denied any knowledge of Buchter's death. At the end of the examination, Lt. Payton advised Appellant that he thought Appellant was lying, escorted Appellant back to Det. Kearney, and advised Det. Kearney that Appellant had lied during the polygraph examination.

Det. Kearney then spoke with Appellant and explained to him that the officers had tape-recorded statements implicating Appellant in the crime and informed Appellant that if he wanted to tell the truth, he

---

**2.** The case was actually tried twice before a jury, but the first jury was unable to reach a unanimous verdict.

would have to do it soon. Appellant began to cry during this encounter with Det. Kearney, and soon told Det. Kearney that he wished to speak with Lt. Payton again. While Lt. Payton prepared for another polygraph examination of Appellant, Appellant told Lt. Payton that he was responsible for Buchter's death. After Lt. Payton further interrogated Appellant for approximately two (2) hours, the investigating officers took a videotaped statement from Appellant.

At trial, the Commonwealth's primary evidence against Appellant consisted of this videotaped statement in which Appellant told the investigating officers that, on the night Buchter was killed: (1) he and some friends—Lewis, Mary Beth Stocking, and B.J. Stocking (Mary Beth's brother)—were drinking at Lewis's house; (2) they ran short of money and decided, at Lewis's suggestion, to rob someone; (3) they drove in Lewis's automobile and parked a block down from Buchter's house; (4) Appellant was drunk and unsure how the group gained entry into Buchter's residence, but they got in somehow; (5) Lewis entered first, followed by Mary Beth Stocking, B.J. Stocking, and then Appellant; (6) Lewis was armed with a BB gun that looked like a 9mm handgun and Appellant was armed with a pipe or tire tool or crowbar that Appellant had taken from the back of Lewis's car; (7) Buchter began screaming when Lewis produced his BB gun and announced the robbery; (8) Appellant then "started panicking. I started swinging the tool up and down … the weapon I had. I think I hit him more than I thought I did";[3] (9) Buchter fell to the floor, and Lewis rifled through his pockets; (10) Appellant dropped the "crowbar" beside Lewis, ran out of the house, and went home.

In his defense, Appellant introduced the testimony of (1) Montgomery, to the effect that Anderson had a poor reputation for truthfulness, and that, contrary to Anderson's testimony, he was not at her home when Appellant allegedly told her about the crime; (2) Meredith, who also testified that he was not present at Anderson's home as Anderson alleged; and (3) several of Buchter's co-workers, who testified that they saw Buchter alive in downtown Louisville around lunch time on Friday, March 17, 1995 although the Commonwealth alleged that Buchter was killed, and Appellant confessed to killing Buchter, the night before.

In addition, Appellant's wife, mother-in-law, and sister-in-law all testified that Appellant was at home the night the crimes were committed. Appellant's wife testified that: (1) Appellant was with her at her parents' house where they lived on the evening of March 16, 1995; (2) she sent Appellant to bed at approximately 10:00 p.m., and joined him soon thereafter; (3) Appellant was in bed with her when her mother awakened her at 2:00 a.m. and when she woke up later that morning; (4) Appellant could not have left the house without her knowledge; and (5) she did not see any blood on Appellant's clothes when she washed them. Appellant's sister-in-law corroborated Appellant's wife's testimony that Appellant was at home that evening and that Appellant was sent to bed at approximately 10:00 p.m. Appellant's mother-in-law, Jeanette Ready, verified that Appellant was at home as of

---

3. Later in his statement, in response to the question of how many times Appellant believed he had hit Buchter with the tool, Appellant explained, "I don't know how many times I hit him. I was drinking, and I got scared … nervous, uh, you know. Like he was going to hit me or something, so I just started swinging the pipe. Didn't mean to hit him with it."

midnight and that Appellant did not go out again in the early morning hours.

Appellant also introduced testimony concerning his mental retardation from two (2) mental health professionals. Dr. Peggy Pack ("Dr. Pack"), a psychologist, testified that: (1) she examined Appellant to determine his level of intellectual functioning; (2) although Appellant had no readily identifiable physical characteristics of retardation, testing demonstrated that Appellant was mildly mentally retarded, with an Intelligence Quotient (IQ) of 65 and communication and socialization skills far below his actual age; (3) while Appellant pretends to understand what people are talking about, in stressful situations, he would have difficulty comprehending others; and (4) mildly mentally retarded people are generally very compliant, dependent on authority figures for direction and guidance, and very much want to please authority figures. Licensed Clinical Psychologist Marilyn Wagner ("Wagner") testified that she, too, examined Appellant, and that her testing reflected that Appellant was mildly mentally retarded with an IQ of 66 and poor communication skills.

At the conclusion of the evidence, the trial court instructed the jury as to the indicted offenses, and the jury returned a verdict finding Appellant guilty of all three (3) counts of the indictment. The trial court entered judgment sentencing Appellant to a thirty (30) year term of imprisonment in accordance with the jury's penalty phase verdict, and this appeal follows. Appellant argues that the trial court erred when it: (1) allowed the Commonwealth to introduce Appellant's videotaped confession; (2) excluded testimony concerning the circumstances surrounding the videotaped confession and challenging

Lt. Payton's administration of the polygraph examination; (3) excluded Dr. Pack's testimony to the effect that Appellant's mental retardation could have caused him to confess falsely; (4) failed to instruct the jury as to voluntary intoxication and lesser-included offenses; and (5) limited Appellant's ability to cross-examine Anderson and Lt. Payton regarding their potential biases. We hold that Appellant's second and fourth allegations of error require reversal for a new trial, and that Appellant's third allegation of error requires further attention by the trial court.

### III. ANALYSIS

### A. APPELLANT'S CONFESSION

#### 1. VOLUNTARINESS

■ Appellant sought suppression of his videotaped confession on the grounds that: (1) he was not advised of his *Miranda*[4] rights in language that he could understand and comprehend and that he, therefore, did not knowingly and intelligently waive those rights; (2) his confession was involuntary and therefore inadmissible under constitutional due process guarantees because the investigating officers interrogated him in a coercive manner; and (3) the factual evidence in the case contradicts the substance of Appellant's confession, and the confession is thus inadmissible because it lacks trustworthiness. Appellant's "shotgun approach" appears to have confused both the record in the trial court and the arguments on appeal. Although the question of whether a defendant has knowingly, voluntarily, and intelligently waived his *Miranda* rights is germane to whether an incriminating statement is "compelled" within the meaning of the Fifth Amendment,[5] those constitutional guarantees are

---

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. *Colorado v. Spring*, 479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987), *quot-*

implicated only in the context of custodial interrogations,[6] and the factual record below conclusively establishes that Appellant voluntarily accompanied Det. Kearney to the police station for questioning. Thus, for purposes of this appeal, Appellant's understanding of his *Miranda* rights is relevant only as part of the totality of the circumstances relevant to questions of due process. Further, while the allegations in Appellant's third stated grounds for suppression may be relevant, in part, to the fact-finder's consideration of the extent to which a confession was the product of coercion, mere factual discrepancies, standing alone, do not constitute grounds for suppression.

Thus, the admissibility of Appellant's videotaped confession turns on whether the method in which it was obtained offends Fourteenth Amendment Due Process guarantees. And, the relevant inquiry is whether the investigating officers coerced the confession "by physical violence or other deliberate means calculated to break the suspect's will" [7] because "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." [8]

After conducting an evidentiary hearing that lasted longer than Appellant's interrogation did, the trial court entered a written order that first summarized the testimony at the hearing and then focused on the question of whether Appellant's confession was the product of police coercion:

> The Commonwealth presented no expert testimony regarding Mr. Rogers'

current intellectual ability. Having considered Dr. Pack's expert testimony on Mr. Rogers' behalf as well as the voluminous records on which she based her report, this Court finds that Mr. Rogers is mentally retarded.

However, the Court must not only consider the above listed factors surrounding the mental status of the accused, but also how those factors relate to the police tactics utilized during the interrogation. The court must determine whether a state actor deprived the accused of due process of law. *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

Mr. Rogers does not allege that he was physically abused, threatened, isolated, or denied necessities. Instead, he insists that Detective Kearney and Lt. Payton misused the polygraph examination to psychologically coerce him into making a statement. Specifically, the officers never informed Mr. Rogers that the test could never be used as evidence by the Commonwealth. In essence, Mr. Rogers states that the officers used the polygraph for no other purpose than to elicit a confession. However, finding no Kentucky cases on this issue, Mr. Rogers cites numerous cases from other jurisdictions in support of his contention that such conduct equates coercion.

This Court finds no authority to support Mr. Rogers' argument. The officers in this case read Mr. Rogers his *Miranda* rights three times. Mr. Rogers willingly signed a waiver of rights form and agreed to take the polygraph examination. At the conclusion of the

---

ing *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). *See also Mills v. Commonwealth*, Ky., 996 S.W.2d 473, 481–482 (1999).

**6.** *See Miranda v. Arizona, supra* note 4.

**7.** *Oregon v. Elstad*, 470 U.S. 298, 312, 105 S.Ct. 1285, 1295, 84 L.Ed.2d 222, 234 (1985).

**8.** *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484 (1986).

examination, Lt. Payton told Mr. Rogers that he failed and obviously was not telling the truth. This type of police conduct is not coercion.

This Court does not doubt that Mr. Rogers intellectual capability is limited. However, this fact alone does not render his statement involuntary.

Mr. Rogers also moves this Court to re-open the suppression hearing to determine the factual validity of Mr. Rogers' statement. Mr. Rogers contends that the reliability and trustworthiness of his statement is relevant to the issue of his mental competence. Nevertheless, Mr. Rogers concedes that reliability is irrelevant to the issue of coercion.

As previously stated, absent police coercion, Mr. Rogers motion to suppress must fail. Therefore, further inquiry into the reliability and trustworthiness of the statement is not necessary at this time. Mr. Rogers is free to challenge the factual validity and reliability of his statement at trial.

Appellant does not contend on appeal that the officers coerced his confession by physical intimidation or threats, but instead contends that the trial court failed to appreciate the "psychological coercion" involved in the officers' interrogation and utilization of the polygraph examination. Appellant argues that, under the "totality of the circumstances"[9]—specifically Appellant's low IQ, the polygraph examiner's deviation from administrative regulations and failure to advise Appellant that the examination results would not be admissible in any judicial proceeding, and the officers' confrontation of Appellant with the questionable "fact" that he had "lied" during the examination—the interrogation constituted impermissible coercion. We disagree, and hold that the trial court properly found that the Commonwealth has proven the voluntariness of Appellant's confession by a preponderance of the evidence.[10]

■ In *Henson v. Commonwealth,*[11] this Court held that:

> To determine whether a confession is the result of coercion, one must look at the totality of the circumstances to assess whether police obtained evidence by overbearing the defendant's will.... The three criteria used to assess voluntariness are 1) whether the police activity was "objectively coercive;" 2) whether the coercion overbore the will of the defendant; and 3) whether the defendant showed that the coercive police activity was the "crucial motivating factor" behind the defendant's confession.[12]

Here, the first criteria—"objectively coercive" police conduct—is lacking. This Court has recognized that police officers use polygraph examinations in connection with suspect interrogations for the purpose of obtaining confessions,[13] and the Kentucky appellate courts have found confessions voluntary despite the fact that they followed polygraph examinations.[14] While Appellant argues that the manner in which the officers in this case (mis)used the polygraph examination in their interrogation of

---

**9.** *See Allee v. Commonwealth,* Ky., 454 S.W.2d 336 (1970).

**10.** *Tabor v. Commonwealth,* Ky., 613 S.W.2d 133, 135 (1981).

**11.** Ky., 20 S.W.3d 466 (2000).

**12.** *Id.* at 469.

**13.** *See Canler v. Commonwealth,* Ky., 870 S.W.2d 219, 221 (1994).

**14.** *See Silverburg v. Commonwealth,* Ky., 587 S.W.2d 241, 244 (1979); *Morgan v. Commonwealth,* Ky., 809 S.W.2d 704, 707 (1991); *Powell v. Commonwealth,* Ky.App., 994 S.W.2d 1 (1998).

a mentally retarded suspect constituted impermissible coercion, we find Appellant's allegations unpersuasive.

■ Appellant's mental retardation is *a factor* to consider in assessing the voluntariness of a confession, but "the mere existence of a mental condition, by itself and apart from its relation to police coercion, does not make a statement constitutionally involuntary." [15] And, here, the record reflects no attempt by the investigating officers to "take advantage" of Appellant's low intelligence. In fact, both of the officers who testified at the suppression hearing indicated that, although they took the time to ensure that Appellant understood his rights, they were unaware of Appellant's mental retardation. Appellant's own expert, Dr. Pack, buttressed this testimony when she explained that Appellant is skillful at masking his low intelligence and that Appellant can appear to understand more than he actually does.

Further, although Appellant argues that the polygraph examiner violated established procedure both by performing a polygraph examination upon a mentally retarded person and by forming a conclusion as to the subject's veracity after performing only one (1) examination, we, like the trial court, fail to see the relevance of these facts to the voluntariness inquiry. Appellant's own expert testified to her opinion that polygraph examinations are unreliable regardless of the subject's IQ, and this Court has consistently disallowed testimony at trial regarding polygraph results—regardless of compliance with administrative regulations—based on our similar conclusions as to the reliability of such examinations.[16] Finally, we observe that, even if the officers possessed *no* legitimate basis for confronting Appellant with polygraph results demonstrating deception, the "employment of a ruse, or 'strategic deception,' does not render a confession involuntary so long as the ploy does not rise to the level of compulsion or coercion." [17] We find nothing inherently or objectively coercive about the interrogation in this case, and the trial court thus properly denied Appellant's motion to suppress his videotaped confession.

■ Appellant alternatively argues that the matter should be remanded to the trial court for reconsideration because the trial court failed to consider evidence relevant to its voluntariness determination when it sustained objections from the Commonwealth regarding certain testimony. We observe, however, that Appellant renewed his motion to suppress after a first jury trial ended with a hung jury, and thus much of this testimony was before the trial court at the time the trial court denied the renewed motion. In any event, however, the substance of this avowal testimony would not "require a conclusion that [Appellant's] statements were involuntary," [18] and thus no remand is warranted.[19]

## 2. CIRCUMSTANCES SURROUNDING APPELLANT'S CONFESSION

■ Although we hold that the trial court properly denied Appellant's motion to suppress his videotaped confession, we find that the trial court committed revers-

---

15. *Lewis v. Commonwealth*, Ky., 42 S.W.3d 605, 612 (2001).

16. *See Morton v. Commonwealth*, Ky., 817 S.W.2d 218, 222 (1991). *See also infra* notes 22 and 23 and surrounding text.

17. *Springer v. Commonwealth*, Ky., 998 S.W.2d 439, 447 (1999).

18. *Lewis v. Commonwealth, supra* note 15 at 612.

19. *Id.*

ible error when it prohibited Appellant from introducing evidence concerning the circumstances under which he made that confession. Specifically, the trial court prohibited Appellant from introducing evidence that he confessed to committing the crimes only after Lt. Payton informed him that he had failed a polygraph examination and that the polygraph examination in question was not conducted in accordance with administrative regulations and accepted procedures. We agree with Appellant that the trial court's ruling was erroneous and prejudicial.

In *Crane v. Kentucky*,[20] the United States Supreme Court held that a defendant's right to present a meaningful defense includes the right to present evidence regarding the credibility of his or her confession:

> [T]he physical and psychological environment that yielded the confession may ... be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. Confessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, a confession may be shown to be "insufficiently corroborated or otherwise ... unworthy of belief." Indeed, stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?

Accordingly, regardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility.

. . .

Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard. That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this type of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and "survive the crucible of meaningful adversarial testing."[21]

The Commonwealth argues that Kentucky's long-standing exclusion of evidence of polygraph results,[22] and rejection of any reference to polygraph examinations,[23] constitutes a "valid state justification" for

---

**20.** 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986).

**21.** *Id.* at 476 U.S. 683, 688–691, 106 S.Ct. 2142, 2146–2147, 90 L.Ed.2d 636, 644–645 (citations omitted).

**22.** *See Morton v. Commonwealth, supra* note 16 at 222; *Ice v. Commonwealth*, Ky., 667 S.W.2d 671, 675 (1984); *Perry v. Common-*

*wealth, ex rel. Kessinger*, 652 S.W.2d 655, 662 (1983); *Henderson v. Commonwealth*, Ky., 507 S.W.2d 454, 460 (1974).

**23.** *See Morgan v. Commonwealth, supra* note 14 at 706; *Baril v. Commonwealth*, Ky., 612 S.W.2d 739, 743 (1981); *Stallings v. Commonwealth*, Ky., 556 S.W.2d 4, 5 (1977).

the trial court's ruling. We hold, however, that, in the circumstances of this case, the defendant's right to present a defense trumps our desire to inoculate trial proceedings against evidence of dubious scientific value.

The crux of Appellant's defense is that he was coerced and coached into a confession by the interrogation techniques—including the use of a polygraph examination—employed by Lt. Payton and Det. Kearney. Appellant contends that when the investigating officers informed him that he had failed the polygraph examination and that he had lied to Lt. Payton in the process, he—in large part because of his limited intellectual capabilities (see Part III(A)(3), *supra*)—confessed to a crime he did not commit. By preventing Appellant from making any reference to the polygraph examination, the trial court pulled the proverbial rug out from under Appellant's defense and left Appellant unable to present the jury with the factual circumstances that he alleged caused him to confess falsely.

■ While this Court's position on the admissibility of polygraph evidence is clear, we also recognize that "[e]vidence relating to the circumstances surrounding [incriminating] statements . . . may be indispensable to [an] appellant's right to present a defense to the crime charged."[24] In *Commonwealth v. Hall*,[25] the Court of Appeals reversed a trial court order suppressing allegedly incriminating statements made "[p]rior to, and in preparation for, [a polygraph] examination . . . in the same room where the polygraph equipment was located."[26] The *Hall* panel, however, held that, although evidence of her confession was admissible, Hall could choose to introduce the circumstances of that confession—including the presence of the polygraph machine—at trial in order to "place before the jury all relevant evidence surrounding the circumstances of her questioning . . . for the purpose of impugning the credibility of her confession."[27]

In support of its holding, the *Hall* panel relied upon an opinion from the Supreme Court of Minnesota, *State v. Schaeffer*.[28] The Schaeffer court addressed the defendant's right to present a defense in circumstances factually analogous to those presented here—i.e., where "defense counsel . . . wanted to elicit some evidence about the polygraph exam in order to show the jury that the interrogation leading to the confession had coercive aspects to it."[29] The Schaeffer court held that such evidence was admissible despite Minnesota's general prohibition against polygraph evidence:

> Cases of both the United States Supreme Court and this court hold that after the trial court denies a motion to suppress a confession as an involuntary confession, the defense may present evidence to the jury on the circumstances surrounding the making of the confession[.]
>
> . . . .
>
> Notwithstanding the general inadmissibility of polygraph evidence, the trial

24. *Morgan v. Commonwealth, supra* note 14 at 708.

25. Ky.App., 14 S.W.3d 30 (2000).

26. *Id.* at 31.

27. *Id.* at 33. *See also Id.* ("[S]hould Hall challenge the credibility of those statements, she may introduce all evidence relating to her questioning, including the videotape [on which the polygraph equipment was visible.]").

28. 457 N.W.2d 194 (Minn.1990).

29. *Id.* at 195.

court had no real choice but to grant defense counsel's request.... "The choice rests with the defense attorney as to whether or not to inject the polygraph issue into the case for the purpose of attempting to show that it or the technique was a coercive factor."[30]

■ We agree with the *Schaeffer* court and hold that, although polygraph evidence is not admissible in Kentucky, a defendant—and only the defendant—has the right, as a matter of trial strategy, to bring evidence of a polygraph examination before the jury to inform the jury as to the circumstances in which a confession was made. In the circumstances of this case, we believe the trial court's exclusion of this evidence prevented Appellant from placing relevant evidence as to the credibility of his confession before the fact-finder, and we thus hold that the trial court erred to Appellant's substantial prejudice when it prevented Appellant from informing the jury as to the circumstances surrounding the disputed confession.

### 3. DR. PACK'S TESTIMONY

■ Although Dr. Pack testified at trial regarding the nature of Appellant's mental retardation, the trial court prohibited Dr. Pack from testifying to her opinion that Appellant's limited mental capacity could have caused him to confess falsely to a crime that he did not commit. The trial court reasoned that this testimony was inadmissible because it addressed the "ultimate issue" of Appellant's guilt or innocence. Appellant preserved this allegation for our review by introducing Dr. Pack's testimony in an avowal outside the presence of the jury:

Q: Dr. Pack, are there specific areas in the—either the videotaped statement or the transcript which you reviewed which reflect confusion on behalf of Mr. Rogers?

A: Yes. There were times he responded he was very confident in a very strong voice he responded. There were other times when he responded, but in a much softer, much more hesitant voice. And then there were times when he was asked questions and he answered it, and then the officer questioned him again, so he changed what he said or how he said it or the language that he used. Didn't seem to understand the difference in a tire tool and a crowbar.

Q: Did you think it was significant that he didn't know how to spell his middle name?

A: Yes.

Q: Are there specific references to the statement that you think demonstrate that John was either not using language that he was familiar with or that he is somehow being led to say what he is saying to the authorities?

A: Specifically where I suppose it's Detective Kearney asked, "Okay. Do you not want a lawyer at this time?" John said softly, "No." And then the detective's response was, "You don't? Okay. You have to answer yes or no for me." John said, "Yes, uh, no," you know "yes, uh, no." He didn't know which way to answer. And so the detective said again, "You don't want a lawyer at this time; correct," and he said "No," but in the very next line of questioning, the officer said, "You understand and know what you're doing; correct," and John answered, "Yes." I'm not sure what the correct answer to that is, if it's no or yes, and apparently John didn't know either.

**30.** *Id.* at 196–197.

He frequently was responding whatever his answer was, if he got an okay response—if he didn't get okay from the detective, then he seemed to try to modify what he said. He didn't offer a lot of testimony that he initiated that seemed to be his own word or fill in any details or descriptions or information that seemed to be volunteered.

Q: Are there other references to the statement that indicate those things?

A: He said things like, "I don't know how we got in," and a lot of his responses were predicated with "I think" as opposed to "I know" or "I did" or "I saw." It's "I think," like he's trying to—he's hoping—he's guessing, he's hoping he's getting the right answers.

Q: Is this type of interrogation, if you're give someone in John's situation who's got a 65 IQ and the adaptive skills you've described, are they capable of creating a story involving themselves in a crime that they didn't really commit in response to that sort of interrogation?

A: Yes, I think he would be capable of that. I think a person of his ability would be capable of that or of trying—attempting to repeat back details or information that he had been given.

Q: So if the police suggested that this is what he was going to say, he is an individual that would say what they told him to say?

A: I think under some circumstances, he would do that if he thought that—perhaps that there was going to be a lesser punishment or that he was going to get home or even that he was going to get to have a cigarette.

Q: And are there any case studies of instances where mentally retarded people in fact falsely—have falsely confessed to crimes they did not do?

A: Yes, there are numerous case studies that document that.

Q: And is that something that you rely upon in your field?

A: Yes.

Q: People that are mentally retarded in situations where they're being interrogated and told by their interrogator that they're lying and—or perhaps confronted with statements that we know you did it, we have evidence that you did it or along that lines, what would—how would a mentally retarded individual react to that sort of interrogation? And we had earlier talked about stress. What other things would you expect to see?

A: It might create doubt in his own mind as to what happened, and it might cause him to be further—to rethink what he said to try to get out of the situation again, to—particularly, as I said, if he thinks that the consequences are going to be greater if he stays with the story he's told or the consequences are going to be greater if he changes his story to what he thinks that the authority figure wants him to say.

Q: Is that irregardless of what the truth is?

A: Yes.

Appellant contends that Dr. Pack's expert opinion was admissible and argues that the trial court erred by excluding this portion of Dr. Pack's testimony. We agree with Appellant that the trial court's stated basis for excluding this testimony—i.e., that it involved the "ultimate issue" at trial—is not relevant to the admissibility inquiry and therefore does not support the trial court's ruling. However, we cannot determine from the record before us whether some or all of Dr. Pack's testimony consti-

tuted an expert opinion admissible under the Kentucky Rules of Evidence.

KRE 702 governs the admissibility of expert opinion testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.[31]

In *Stringer v. Commonwealth*,[32] we interpreted KRE 702 as abrogating the former common law, "ultimate issue" rule and held that:

> The real question should not be whether the expert has rendered an opinion as to the ultimate issue, but whether the opinion "will assist the trier of fact to understand the evidence or to determine a fact in issue." Generally, expert opinion testimony is admitted when the issue upon which the evidence is offered is one of science and skill, and when the subject matter is outside the common knowledge of jurors.[33]

Thus, KRE 702 authorizes the introduction of expert opinion testimony where:

(1) the witness is qualified to render an opinion on the subject matter, (2) the subject matter satisfies the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), (3) the subject matter satisfies the test of relevancy set forth in KRE 401, subject to the balancing of probativeness against prejudice required by KRE 403, and (4) the opinion will assist the trier of fact per KRE 702.[34]

Although the trial court's ruling predated the Stringer opinion, Stringer merely interpreted KRE 702, which had been adopted at the time of Appellant's trial. Thus, while the trial court improperly framed the issue by focusing upon whether Dr. Pack's testimony embraced an "ultimate issue," the question of whether Dr. Pack's testimony constituted "specialized knowledge [that would] assist the trier of fact to understand the evidence or to determine a fact in issue"[35] was *part* of the relevant inquiry. While we believe that at least portions of Dr. Pack's excluded testimony would have assisted the trier of fact by providing an explanation for Appellant's "confession" that would rebut the common assumption that people do not ordinarily make untruthful inculpatory statements,[36]

---

31. KRE 702.

32. Ky., 956 S.W.2d 883 (1997) (citation omitted).

33. *Id.* at 889 (citations omitted).

34. *Id.* at 891.

35. KRE 702.

36. *See Holloman v. Commonwealth*, Ky., 37 S.W.3d 764, 767 (2001) (evidence that defendant was prone to manipulation, suggestion, and intimidation because of his mental retardation "should not have been excluded on the basis of relevancy because it was permissible evidence bearing directly on the reliability of his statements.") *Pritchett v. Commonwealth*, 263 Va. 182, 557 S.E.2d 205, 208 (2002)

(psychiatric testimony connecting mental retardation and false confessions "presented information on subjects unfamiliar to jury that would assist it in determining the reliability of [the defendant's] confession."); *United States v. Shay*, 57 F.3d 126, 129–30 (1st Cir.1995) (psychiatrist's testimony that defendant suffered from a mental disorder that caused him to make false statements inconsistent with his self-interest "could have 'exploded common myth' about evidence vital to the [prosecution's] case."); *United States v. Hall*, 93 F.3d 1337, 1345 (7th Cir.1996) ("It was precisely because juries are unlikely to know that social scientists and psychologists have identified a personality disorder that will cause individuals to make false confessions that the testimony would have assisted the jury in making its decision.").

the trial court's misconstruction of the relevant inquiry meant that it did not evaluate which portions of Dr. Pack's testimony would have assisted the jury. Nor did it address the other three-fourths of the Stringer analysis. Although no one appears to dispute Dr. Pack's qualifications (Stringer factor # 1), the trial court's ruling excluding this testimony on "ultimate issue" grounds left unanswered questions relating to the scientific reliability (Stringer factor # 2) of testimony linking mental retardation and false confessions [37] and whether, even if generally scientifically reliable, Dr. Pack's opinions as to the reliability of Appellant's individual "confession" satisfied the "prejudice v. probativeness" test of KRE 403 (Stringer factor # 3).

Accordingly, upon remand, the trial court should conduct an evidentiary hearing to determine whether the proffered testimony is admissible under KRE 702, as interpreted by *Stringer* and should focus upon whether Dr. Pack's proffered testimony is sufficiently reliable,[38] and, if so, whether the KRE 403 relevancy inquiry warrants limitations on the scope of Dr. Pack's testimony.

## B. JURY INSTRUCTIONS

The trial court instructed the jury only as to the indicted offenses of Murder, First–Degree Robbery, and First–Degree Burglary, and denied Appellant's request that it instruct the jury regarding the law of voluntary intoxication and the lesser-included offenses of First–Degree Manslaughter, Second–Degree Manslaughter, Reckless Homicide, and First–Degree Criminal Trespass. We hold that the trial court erred when it failed to instruct the jury regarding voluntary intoxication and First and Second–Degree Manslaughter.

We begin our analysis by observing the well-settled principles that: (1) "it is the duty of the trial judge to prepare and give instructions on the whole law of the case ... [including] instructions applicable to every state of the case deducible or supported to any extent by the testimony";[39] and (2) although a defendant has "a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury on proper instructions,"[40] the trial court should instruct as to lesser-included offenses " 'only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense.' "[41]

In this case, Appellant did not testify at trial, and the only evidence introduced at trial as to Appellant's level of intoxication or state of mind at the time he allegedly committed the indicted offenses came in

**37.** We observe, however, that in its recent opinion holding that the Eighth Amendment to the United States Constitution prohibits capital punishment for mentally retarded persons, the United States Supreme Court has taken note of the phenomenon of mentally retarded persons falsely confessing to crimes they did not commit. *Atkins v. Virginia,* —— U.S. ——, —— n. 25, 122 S.Ct. 2242, 2252 n. 25, 153 L.Ed.2d 335, —— n. 25 (2002).

**38.** *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Mitchell v. Common-* *wealth,* Ky., 908 S.W.2d 100 (1995) (adopting *Daubert* ), overruled on other grounds, *Fugate v. Commonwealth,* Ky., 993 S.W.2d 931 (1999); *Goodyear Tire and Rubber Co. v. Thompson,* Ky., 11 S.W.3d 575, 578–9 (2000).

**39.** *Taylor v. Commonwealth,* Ky., 995 S.W.2d 355, 360 (1999).

**40.** *Id.*

**41.** *Gabow v. Commonwealth,* Ky., 34 S.W.3d 63, 72 (2000) (*quoting Houston v. Commonwealth,* 975 S.W.2d 925, 929 (1998)).

Appellant's alleged statement to Anderson and in his videotaped confession. Therefore, we analyze each of Appellant's allegations of error involving jury instructions that the trial court failed to give by determining whether Appellant's prior incriminating statements provided sufficient evidence to justify the instruction.

## 1. VOLUNTARY INTOXICATION

In his videotaped confession, Appellant, a five (5) foot tall, eighteen (18) year old, who weighed less than one hundred and twenty-five (125) pounds: (1) told the investigating officers that he had consumed about twelve (12) beers the night that he attacked Buchter; and (2) described his state of intoxication in stating "I was real drunk." Additionally, Appellant demonstrated in his statement that he was unsure about many of the details of the crimes, e.g., where specifically they parked, how the group gained entry into Buchter's home ("I ... I don't know how we got in, but I know we got in."), the race of the victim, and the number of times that Appellant struck Buchter with the weapon—an instrument that Appellant described at various times as a pipe, a tire tool, and a crowbar.

 A voluntary intoxication instruction is justified only when there is evidence that the defendant "was so drunk that he did not know what he was doing," [42] or when the intoxication " 'negatives the existence of an element of the offense.' " [43] Although we agree with the Commonwealth that mere drunkenness does not equate with the Kentucky Penal Code's definition of the "defense" of voluntary intoxication,[44] we believe the evidence here demonstrated more than "mere drunkenness" and supported the requested instruction. We find that the jury in this case reasonably could have concluded that Appellant's intoxication inhibited his capacity to form the intent necessary to commit the crimes charged in the indictment. Accordingly, we hold that, if the evidence is the same at Appellant's retrial, the trial court should instruct the jury as to the law of voluntary intoxication.[45]

## 2. LESSER–INCLUDED CRIMINAL HOMICIDE OFFENSES

 In describing his conduct that caused Buchter's death, Appellant consistently denied that he intended to kill Buchter. In his alleged statement to Anderson, Appellant specifically stated that he did not intend to kill Buchter. In his videotaped statement, Appellant first stated:

I started panicking. I started swinging the tire tool up and down ... the weapon that I had. *I think I hit him more than I thought I did.*

And later stated:

I don't know how many times I hit him. I was drinking and I got scared ... nervous, uh, you know. Like he was gonna hit me or something, so I just

---

**42.** *Meadows v. Commonwealth*, Ky., 550 S.W.2d 511, 513 (1977).

**43.** *Mishler v. Commonwealth*, Ky., 556 S.W.2d 676, 679 (1977). *See also supra* note 54.

**44.** *See e.g., Jewell v. Commonwealth*, Ky., 549 S.W.2d 807, 812 (1977) ("Mere drunkenness will not raise the defense of intoxication."), *overruled in part, Payne v. Commonwealth*, Ky., 623 S.W.2d 867, 870 (1981).

**45.** Pursuant to *Fields v. Commonwealth*, Ky., 12 S.W.3d 275, 282 (2000), this instruction would also entitle Appellant to an instruction on Second–Degree Manslaughter. *Id.* ("Thus, if a jury is instructed on voluntary intoxication as a defense to intentional murder or first-degree manslaughter, it must also be instructed on second-degree manslaughter as a lesser included offense; and the failure to do so is prejudicial error." (citation omitted)).

started swinging the pipe. *Didn't mean to hit him with it.*

Although the jury was certainly free to infer from the circumstances that Appellant intended to cause Buchter's death, we hold that the Appellant's statements quoted above also permitted reasonable doubts as to his state of mind at the time he allegedly killed Buchter, and thus required the trial court to instruct the jury as to First and Second–Degree Manslaughter.[46] Again, Appellant specifically denied any intent to kill in his alleged statement to Anderson. And, in his videotaped confession, Appellant stated, "I think I hit him more than I thought I did." These statements, considered in the context of Appellant's explanation that he began hitting Buchter only after the man began screaming, reasonably permits the inference that Appellant struck Buchter not with the intention of killing him, but with the intention of incapacitating him to stop his screaming—i.e. under circumstances that could constitute either First or Second–Degree Manslaughter. A finding of First–Degree Manslaughter would be proper if the jury found that Appellant caused Buchter's death while intending only to cause him serious physical injury.[47] A finding of Second–Degree Manslaughter would be proper if the jury believed that Appellant unintentionally caused Buchter's death while "consciously disregard[ing] a substantial and unjustifiable risk that [death] [would] occur"[48] when he struck him re-

peatedly with the weapon. Although we believe the jury could reasonably have returned a verdict for either First or Second–Degree Manslaughter, we do not believe it reasonably could have concluded that Appellant failed to appreciate the risk that his repeated blows to Buchter's head would cause Buchter's death,[49] and thus the trial court properly denied Appellant's request for a Reckless Homicide instruction.

### 3. FIRST DEGREE CRIMINAL TRESPASS

We find no merit to Appellant's suggestion that the trial court should have instructed the jury regarding First–Degree Criminal Trespass as a lesser-included offense to First–Degree Burglary. While First–Degree Criminal Trespass can be a lesser-included offense of First or Second–Degree Burglary,[50] such an instruction is proper only where the jury could reasonably conclude that Appellant unlawfully entered a home without the intent to commit a crime. Here, Appellant's statement is clear that the group went to Buchter's home for an exclusively criminal purpose—i.e., to commit a robbery—and thus Appellant's statement provides no basis for a First–Degree Criminal Trespass instruction.[51] Nor do we believe that a proper voluntary intoxication instruction affects this analysis because, under the evidence in this case, we see no basis upon which a reasonable juror could conclude

---

46. *See Commonwealth v. Wolford,* Ky., 4 S.W.3d 534, 539–540 (1999) ("[W]here . . . the evidence . . . does not conclusively establish [the defendant's] state of mind at the time he killed the victim, it is appropriate to . . . leave it to the jury to sort out the facts and determine what inferences and conclusions to draw from the evidence.").

47. KRS 507.030(1)(a).

48. KRS 501.020(3).

49. *See Adcock v. Commonwealth,* Ky., 702 S.W.2d 440 (1986).

50. *Martin v. Commonwealth,* Ky., 571 S.W.2d 613, 614 (1978).

51. *Commonwealth v. Sanders,* Ky., 685 S.W.2d 557, 559 (1985) ("We do not have testimony or circumstances [from which] the jury could infer that there was presence in the house with no intent to commit a crime.").

that Appellant was sober enough to "knowingly enter[ ] or remain[ ] unlawfully"[52] in Buchter's house, but was too intoxicated to form the intent to commit a crime. Although voluntary intoxication cannot negate the mental states of wantonness or recklessness,[53] such intoxication may negate the KRS 501.030(2) "knowingly" mental state.[54] The trial court properly denied Appellant's request for a First–Degree Criminal Trespass instruction.

## C. LIMITATION OF CROSS–EXAMINATION

■ Appellant's final claim of error is that the trial court erred to his prejudice when it prevented him from cross-examining Lt. Payton and Anderson about alleged biases. Specifically, Appellant wanted to cross-examine Lt. Payton about his August, 1996 disciplinary demotion to Sergeant after he was arrested for DUI and wanted to cross-examine Anderson regarding her felony charges that were at that time pending before the Jefferson District Court. We hold that the trial court properly determined that this proposed cross-examination was improper because Appellant has made "no showing that the cross-examination would expose some motivation for testimony being given."[55] Avowal testimony revealed that both Lt./Sgt. Payton's demotion and Anderson's felony charges arose well after the indictment in this case and that both were unrelated to Appellant's prosecution. The trial court

did not err in excluding the evidence of Payton's demotion.

## IV. CONCLUSION

For the above reasons, we reverse the judgment of the Jefferson Circuit Court and remand this matter to the trial court for a new trial in accordance with this opinion.

LAMBERT, C.J.; JOHNSTONE and STUMBO, JJ., concur.

COOPER, J., concurs in part and dissents in part by separate opinion in which GRAVES and WINTERSHEIMER, JJ., join.

COOPER, Justice, Concurring in Part and Dissenting in Part.

I disagree with two aspects of the majority opinion. One relates to the extent of polygraph evidence admissible upon retrial. The other relates to the majority's conclusion that Appellant was not entitled to an instruction on first-degree criminal trespass as a lesser included offense of first-degree burglary.

### 1. Polygraph evidence.

I agree that *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), permits Appellant to attack the credibility of his own confession by showing that it was made in response to the polygraph examiner's statement that he had failed the polygraph examination.

---

52. KRS 511.060(1).

53. *Brown v. Commonwealth*, Ky., 575 S.W.2d 451, 452 (1979).

54. *See* Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law*, § 2–6(b)(2) at 87 (LEXIS 1998) ("A person acts 'knowingly' under Kentucky law when he is *aware* of the nature of his conduct (e.g., entry into a dwelling) or of an attendant circumstance ...; intoxication could result in a lack of awareness

on the part of an actor and thus has the potential to negate the mental state of knowledge."). After all, we have described the proof necessary for the voluntary intoxication defense as "evidence sufficient to support a doubt that the defendant *knew what he was doing*." *Moore v. Commonwealth*, Ky., 771 S.W.2d 34, 36 (1989) (emphasis added).

55. *Bray v. Commonwealth*, Ky., 703 S.W.2d 478, 479 (1986).

However, I would not permit Appellant to challenge the procedures used in administering the polygraph examination because that evidence goes to the issue of whether Appellant did, in fact, fail the examination. If Appellant can attack the validity of the polygraph examination, surely the Commonwealth can rebut that attack with evidence that the examination was properly conducted and that Appellant did, in fact, fail. This would then require a limiting admonition to the jury similar to the one approved in *State v. Schaeffer*, 457 N.W.2d 194 (Minn.1990), the case upon which the majority primarily relies. In my view, however, the issue is not whether Appellant passed or failed the examination but whether his confession was induced by the assertion (correct or incorrect) that he had failed. I would limit the polygraph evidence to that issue alone.

## 2. First-degree criminal trespass.

Voluntary intoxication is a defense to an offense if it "[n]egatives the existence of an element of the offense." KRS 501.080(1). However, voluntary intoxication does not negate a culpable mental state of wantonness because voluntary intoxication, itself, supplies the element of wantonness. KRS 501.020(3). Even if Appellant was so intoxicated as to negative the element of intent necessary to convict him of murder or first-degree manslaughter, such would not be a complete defense but would only reduce the offense to a wanton homicide, *i.e.*, second-degree manslaughter. *Fields v. Commonwealth*, Ky., 12 S.W.3d 275, 282 (2000); *Slaven v. Commonwealth*, Ky., 962 S.W.2d 845, 857 (1997). However, there is no lesser offense of wanton robbery, *Slaven* at 857, or wanton burglary. To the extent that intoxication negatives the element of intent to commit a theft, "the theft element of robbery evaporates," and the assault element is reduced to a charge of wanton assault. *Id.* Where, as here, however, the assault element of the robbery charge merges with the homicide charge, intoxication is an absolute defense to robbery. *Id.* Burglary also has two mens rea elements, *i.e., knowingly* entering or remaining in the building or residence of another with the *intent* to commit a crime therein. KRS 511.020; 511.030; 511.040. If Appellant was so intoxicated as to negative either the knowledge element or both the knowledge and intent elements of burglary, intoxication is an absolute defense, but if the jury believed that Appellant's intoxication negatived only the element of intent and not the element of knowledge, Appellant would still be guilty of first-degree criminal trespass. KRS 511.060. Thus, Appellant was entitled to an instruction on first-degree criminal trespass as a lesser included offense of first-degree burglary.

GRAVES and WINTERSHEIMER, JJ., join this opinion, concurring in part and dissenting in part.