RENDERED: JANUARY 21, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0181-MR

TIMOTHY HARGROVES, JR.                                             APPELLANT

V.                  ON APPEAL FROM HARDIN CIRCUIT COURT
HONORABLE KEN M. HOWARD, JUDGE
NO. 17-CR-00982

COMMONWEALTH OF KENTUCKY                               APPELLEE

**OPINION OF THE COURT BY JUSTICE NICKELL**

**<u>AFFIRMING</u>**

Timothy Hargroves, Jr., appeals as a matter of right from a Hardin Circuit Court judgment convicting him of murder in the death of neighbor Bernard Williams; first-degree assault in the shooting of Millareisha Dixon, the mother of his two-year-old daughter,[1] with whom he argued a day earlier upon seeing her and their child with another man; and first-degree wanton endangerment of their child who was sitting beside Dixon when Hargroves shot Dixon in the chest. Jurors also found Hargroves guilty of possessing marijuana. Consistent with the jury's recommendation, he was sentenced to a

---

[1] To protect the two-year-old's identity she will be referred to as "child."

combined term of forty-five years' imprisonment. On appeal, he alleges he was wrongly denied instructions on extreme emotional disturbance (EED) and voluntary intoxication; the lead detective impermissibly told jurors Hargroves was guilty and doubted he acted in self-defense; the prosecutor improperly reenacted a version of the shooting; and, while Hargroves was advised of his rights[2] before being interviewed at the Radcliff Police Department, he should have received a second warning before talking to another officer while being transported to the Hardin County Detention Center. Following review of the record, briefs and law, we affirm the trial court.

**FACTS**

Hargroves and Dixon had a rocky relationship. Though unmarried, they had a child in common and the trio lived together in a second-floor apartment in Radcliff, Kentucky. Dixon, a former soldier, had custody of the child. In closing argument, the Commonwealth theorized the shooting resulted from Hargroves' attempt to eliminate Dixon to gain custody of their child.

On the night of November 1, 2017, Hargroves came home to find Dixon and their child in the company of a man who jumped out a window. Hargroves said he was upset—not because Dixon was with another man—but because his child was with them. That night, Hargroves and Dixon established they were not a couple, Dixon was not "his," and Dixon could do as she pleased.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

2

The next morning, Hargroves and two friends bought a bottle of Smirnoff Vodka and began drinking. The remainder of the bottle was given to a fourth person. The amount of liquor Hargroves consumed was never quantified.

Just before 8:00 p.m., dressed in multiple layers of clothing with a full outer layer of field camouflage, and armed with a .38 special revolver containing six bullets, Hargroves went to Williams' first-floor apartment. Williams was a career Army veteran described as a "gentle giant." According to Hargroves, he and Dixon would often "chill" with Williams in his apartment—which was directly below theirs—where Williams shared his "wisdom." Williams and Dixon were not romantically involved. Also, Hargroves was not jealous of the older Williams whom he considered a "friend" and "homey."

Hargroves knocked loudly on Williams' door—loud enough to awaken an upstairs neighbor who was napping. Receiving no response, Hargroves knocked again, louder this time, again rousing the upstairs neighbor. When Williams opened his apartment door, Dixon and their child were sitting on the couch. Hargroves quickly fired six shots through the open door, striking Williams four times—once in the spine—and striking Dixon once in the chest. The child was unharmed. Hargroves fled on foot.

Radcliff Police Officer Brad Hunt arrived on scene two minutes after hearing the call of "shots fired." With his bodycam recording, he found Williams on the floor just inside the apartment door struggling to breathe; a child was sitting on the couch. Officer Hunt rendered first aid to Williams who managed to give his name and say Tim Hargroves, his upstairs neighbor, had

3

shot him. Williams was taken to University Hospital where he was pronounced dead of multiple gunshot wounds after six minutes of treatment.

As Officer Jason Vance arrived on scene, Dixon approached him in the parking lot with a bleeding chest wound. She was transported to the hospital where she would remain five days after trauma surgeon Dr. Keith Miller inserted a chest tube. He diagnosed Dixon as having a collapsed lung, pulmonary contusion of the lung, clavicle and rib fractures, bleeding from the lung itself, and air around the heart. Dr. Miller testified blood around Dixon's heart could have been fatal without treatment.

Based on Williams' identification of Hargroves as the shooter, officers quickly focused on him. Hargroves had telephoned his father, also a friend of Williams, asking him to collect his child from Williams' apartment and care for her. Hargroves' father complied and while on scene gave officers his son's cell number. Det. Michael Berry used the number to "ping" Hargroves' phone repeatedly and relay his movement to searchers.

Following Det. Berry's coordinates, Officer Shawn Frakes heard rustling in a wooded area. He illuminated the zone with a light on his rifle, and spotted Hargroves about 750 feet behind the apartment complex. Hargroves obeyed Officer Frakes' commands and emerged from the woods where Officer Wyatt Rossell handcuffed him.

When apprehended around 11:00 p.m., Hargroves was unarmed, but possessed three baggies of marijuana, $470 in cash, and debit cards. His

4

cellphone was found nearby.  Officer Rossell noted Hargroves smelled of alcohol but followed all police commands in surrendering.

Hargroves did not assist officers in finding the revolver he normally wore in a holster concealed under his clothing.  After daylight, the gun was recovered under leaf matter within 60 feet of Williams' apartment.  Ballistics linked the revolver to the shooting.  Hargroves was taken to the Radcliff Police Department where he submitted to a gunshot residue test which also connected him to the shooting.  After receiving a *Miranda* warning, he agreed to talk but feigned foggy memory and revealed nothing about the shooting.  When Det. Berry asked whether he shot in self-defense, Hargroves did not respond.

While he shared no details of the actual shooting, Hargroves recalled events preceding the shooting with clarity.  He said he spent the day drinking with two friends, Sam and Powell; he played the video game Call of Duty; he played with Spanish kids in the neighborhood; and, he learned some Spanish from Ruth.  During the interview, Hargroves reached for the holster buried under his clothing and realized it was empty.

Questioning continued until about 1:17 a.m. when Hargroves moved from the interview room to the adjacent squad room.  Around 1:53 a.m., sitting on a bench, with his hands cuffed behind his back and wearing a white police-issued jumpsuit, Hargroves spontaneously said he now recalled the shooting. Officer Daniel Padilla activated his bodycam and recorded the conversation.

Hargroves asked the whereabouts of his "chain."  He said upon seeing a chain (necklace) being collected from him and taken into evidence, he suddenly

5

remembered walking inside Williams' apartment—as he had done numerous times—and Williams choking him so violently he was lifted off the ground to the point he "almost" could not breathe. Hargroves went on to say one of three chains he was wearing around his neck was broken by Williams' force, and he shot Williams because Williams choked him. When asked who he was trying to shoot—because both Williams and Dixon were struck—Hargroves said, "I think I was trying to shoot him." As he continued talking, Hargroves said, "Jesus saved her (Dixon) last night, cause I was supposed to be gone last night. I swear, I was supposed to be gone last night." Hargroves denied arguing or quarreling with Williams prior to the shooting which according to the upstairs neighbor quickly followed the second round of door knocks he had heard.

A chain with a medallion and intact clasp was collected from Hargroves' pocket and taken into evidence along with five rings and a bracelet. A second chain, with a broken clasp, was found on the ground outside Williams' apartment, eight to ten feet from the threshold.

Just after 2:00 a.m., Officer Rossell drove Hargroves approximately thirty minutes to the Hardin County Detention Center. During the drive, Hargroves again said, "I shot Mr. Bernard (Williams) because he choked me. He choked me and he grabbed me by the neck and lifted me up in the air. Hey, I'm pretty sure. I'll probably get attempted murder and have to do time for that." Hargroves also said Dixon had a controlling personality, had threatened to kill his entire family, and would not allow him to smoke marijuana or spice. Despite criticizing Dixon, Hargroves never said he shot out of revenge or anger

6

toward her for being with another man. Instead, he attributed the shooting entirely to Williams choking him, lifting him off the ground, and breaking his chain, after which he said he was sorry and had gone "too far."

During the ride to the jail, Hargroves evinced concern that no one had looked at or photographed his neck to preserve evidence of the alleged choking because it "might help my case." Upon arrival at the jail, both Officer Rossell and a nurse inspected Hargroves' neck for injuries but found no sign of choking or other fresh injury. Additional facts will be developed as warranted.

## ANALYSIS

## I. Denial of Requested Jury Instructions

Hargroves claims the trial court erred in denying instructions on EED and voluntary intoxication, both of which he requested and included in tendered instructions.

> It is well established that the trial court is required to instruct the jury on the "whole law of the case, and this rule requires instructions applicable to every state of the case deducible or supported to any extent by the testimony." *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky. 1999) (citing Kentucky Rule of Criminal Procedure (RCr) 9.54(1); *Kelly v. Commonwealth*, 267 S.W.2d 536, 539 (Ky. 1954)). Additionally, the trial court is required to "instruct the jury on all lesser-included offenses which are supported by the evidence." *Yarnell v. Commonwealth*, 833 S.W.2d 834, 837 (Ky. 1992) (citing *Cannon v. Commonwealth*, 777 S.W.2d 591 (Ky. 1989)); *McClellan v. Commonwealth*, 715 S.W.2d 464 (Ky. 1986). While we evaluate the trial court's decision to instruct on a specific claim for an abuse of discretion, the substantive content of the jury instructions will be reviewed de novo. *Sargent v. Shaffer*, 467 S.W.3d 198, 204 (Ky. 2015).

*Gribbins v. Commonwealth*, 483 S.W.3d 370, 373 (Ky. 2016). A trial court abuses its discretion when it acts arbitrarily, unreasonably, unfairly, or takes

7

action "unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). Under the facts of this case, we discern no instructional error and no abuse of discretion.

### a. EED

Under proper facts, EED reduces murder, a capital offense under Kentucky Revised Statutes (KRS) 507.020, to first degree manslaughter, a Class B felony under KRS 507.030(1)(b). *See McClellan,* 715 S.W.2d at 468. EED is a successor to the "old common law concept of 'heat of passion[.]'" *Driver v. Commonwealth*, 361 S.W.3d 877, 887 (Ky. 2012). It is defined as

> a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefor, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as defendant believed them to be.

*McClellan*, 715 S.W.2d at 468–69.

To justify giving an EED instruction, Hargroves needed definite and non-speculative proof, *Padgett v. Commonwealth*, 312 S.W.3d 336, 341 (Ky. 2010), of an occurrence "so dramatic as to render the mind temporarily uncontrollable and provoke 'an explosion of violence.'" *Luna v. Commonwealth*, 460 S.W.3d 851, 883 (Ky. 2015). Neither Hargroves, nor Dixon, the only surviving eyewitnesses—other than their two-year-old daughter—testified. Thus, jurors heard no firsthand account of the shooting. To establish his defense,

8

Hargroves relied solely on post-shooting statements he had given police, portions of which the Commonwealth introduced during its case-in-chief. Hargroves' words simply did not describe the "explosion of violence as a result of some triggering event" needed to justify an instruction on EED. *Id.*

Appellate counsel frames the "triggering event" as "Hargroves coming home to find his girlfriend with another man" in the presence of his child. Hargroves told police he found Dixon in their apartment with another man on November 1, 2017—the night before the shooting. Williams was *not* the "man" Hargroves found with Dixon in their apartment. After the "man" fled through the window, Hargroves and Dixon discussed their relationship and Hargroves came to realize Dixon was not his wife, he did not "own" her, and she could do as she pleased. Hargroves evinced no qualms about Dixon and their child being in Williams' apartment and emphatically stated Dixon and Williams were not romantically involved. Hargroves never linked the shooting to finding Dixon with another man. In fact, he said Dixon being with another man did *not* upset him. His sole concern about the prior night was his daughter being with Dixon and the "other man." Based on Hargroves' own words, contrary to appellant's brief, events of the previous day could not have constituted the "triggering event" required by *Luna* to support an EED instruction.

Moreover, Hargroves' multiple statements to police were consistent and did not indicate he shot out of rage or anger. According to Hargroves, he knocked on Williams' door. When no one answered, he knocked again. When Williams opened the door, Hargroves said he realized Dixon and their child

9

were inside and Williams almost immediately began violently choking Hargroves, lifting him off the ground to the point he could barely breathe, and breaking a chain he was wearing around his neck, "cause I walked in his house."

Hargroves maintained he shot Williams to stop Williams from choking him. Based on Hargroves' own statements, believing he acted because he saw Dixon with another man the previous night would have been speculation at best, contrary to Hargroves' statements, and insufficient basis for an EED defense under *Padgett*, 312 S.W.3d at 341. As told by Hargroves, if anyone was upset or angry the night of the shooting, it was Williams who allegedly choked Hargroves for no reason other than he entered Williams' apartment. Because the proof did not establish a dramatic, triggering event supporting EED, the trial court did not abuse its discretion in denying the requested instruction.

### b. Voluntary Intoxication

Hargroves next argues the jury should have been instructed on voluntary intoxication—a defense only when it "[n]egatives the existence of an element of the offense[.]" KRS 501.080(1). This Court has construed the statute to mean

> "the [voluntary intoxication] defense is justified only where there is evidence reasonably sufficient to prove that the defendant was so [intoxicated] that he did not know what he was doing." *Fredline* [*v. Commonwealth*, 241 S.W.3d 793, 797 (Ky. 2007)] (quoting *Rogers v. Commonwealth*, 86 S.W.3d 29, 44 (Ky. 2002)). "[M]ere drunkenness," in other words (sic)—i.e., the mere impairment of judgment and/or physical control that commonly leads intoxicated persons to do things they

would not ordinarily do—"does not equate with the Kentucky Penal Code's definition of the 'defense' of voluntary intoxication." *Nichols* [*v. Commonwealth*, 142 S.W.3d 683, 688 (Ky. 2004)] (quoting *Rogers* [v. *Commonwealth*, 86 S.W.3d 29, 44 (Ky. 2002))]. The defense requires proof of something "more" than "mere drunkenness." *Id.*

*Conyers v. Commonwealth*, 530 S.W.3d 413, 432 (Ky. 2017).

In statements to police, Hargroves claimed he blacked out after consuming vodka with friends the morning of the shooting; still smelled of alcohol when apprehended at 11:00 p.m.; and, was so drunk he did not realize his revolver was missing when questioned by police. He relies on *Nichols* wherein evidence supported an instruction on voluntary intoxication because a witness testified Nichols was "acting wild." Unlike Nichols, no one testified Hargroves was acting wild or was drunk. Still, he maintains he could not have formed the intent needed for conviction of intentional murder, first-degree manslaughter or intentional second-degree assault. Citing *Mishler v. Commonwealth*, 556 S.W.2d 676, 680 (Ky. 1977), he insists a voluntary intoxication instruction should have been given no matter how "preposterous" his story.

In contrast, the Commonwealth argues the most Hargroves established was mere drunkenness, far below the elevated showing required by *Conyers*. In the Commonwealth's view, Hargroves and two friends bought a bottle of vodka the morning of the shooting, began drinking, and gave the remainder of the bottle to Hargroves' "girl." Thus, at least four people shared a partial bottle of vodka, with neither the amount of alcohol Hargroves personally consumed,

11

nor the period of time in which he drank it, being quantified. Hargroves' ability to specify "Smirnoff" vodka was purchased when describing his day to police shows he was able to recall minute details and belies the extreme drunkenness needed for an involuntary intoxication instruction.

Hargroves, who donned full camouflage at some point, apparently navigated the bulk of the day without incident. He played Call of Duty, played with Spanish kids in the neighborhood, and learned Spanish from Ruth. He returned to the apartment complex and went directly to Williams' apartment where he knocked on the door. When no one answered, he knocked again. About 7:53 p.m., when Williams opened the door, Hargroves knowing Dixon and his child were inside, fired six shots into the apartment and fled on foot.

After the shooting, he concealed himself in trees behind the complex, and called his father to collect and care for his daughter. The Commonwealth theorized Hargroves would not have called his father to arrange for child care had he believed Dixon was alive and able to care for their daughter. Hargroves kept his cellphone nearby. When an officer heard rustling in a wooded area, and saw Hargroves standing there, Hargroves followed the officer's verbal commands, without error, and surrendered as Officer Rossell handcuffed him.

Once in custody, Hargroves chose to waive his *Miranda* rights and speak. In two conversations at the police department, one of which was played for jurors, his speech was not garbled; his story was consistent; and, he expressed himself, clarified details, and drew critical distinctions. For example, he knew he had loaded six bullets in the revolver, knew he had no more ammunition,

and understood officers to say the six bullets he fired had struck Williams; he questioned how Dixon had also been struck. He also distinguished having a girlfriend from having a wife, saying a girlfriend is not "mine."

Hargroves' memory of the day's events seemed intact and clear until just before the shooting. When Det. Berry initially asked him whether he shot in self-defense, Hargroves did not answer. Later, after developing a self-defense theory, he said he then recalled shooting Williams "because he choked me." He went on to say, "But I know for sure that man picked me up and choked me. So, [inaudible] I opened up fire on his ass." Hargroves' own words indicate he deliberately chose to shoot Williams because he was being choked and could not breathe. He also said, "Mr. Bernard [Williams] was my friend. I went too far. But he went too far too. I was drinking." Under *Fredline*, while Hargroves may have consumed alcohol, the proof does not show he was so drunk he did not know what he was doing. Therefore, we cannot say the trial court abused its discretion by declining to instruct jurors on voluntary intoxication.

## II.  Whether Det. Berry Expressed Opinion on Hargroves' Guilt

Hargroves' next claim is Det. Berry, in describing the decision to charge Hargroves with murder in Williams' death, wrongly conveyed to jurors his personal belief Hargroves did not act in self-defense and was guilty of murder. Defense counsel did not object to this line of questioning during trial, rendering the claim unpreserved for our consideration and prompting a request for palpable error review under RCr 10.26. Proper application of the rule is explained in *Martin v. Commonwealth*, 409 S.W.3d 340, 344 (Ky. 2013).

13

> Under RCr 10.26, an unpreserved error may generally be noticed on appeal *if* the error is "palpable" and *if* it "affects the substantial rights of a party." Even then, relief is appropriate only "upon a determination that manifest injustice resulted from the error." RCr 10.26. "For an error to rise to the level of palpable, 'it must be easily perceptible, plain, obvious and readily noticeable.'" *Doneghy v. Commonwealth*, 410 S.W.3d 95, [106] (Ky. 2013) (quoting *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky.2006)). Generally, a palpable error affects the substantial rights of the party "only if it is more likely than ordinary error to have affected the judgment." *Ernst v. Commonwealth*, 160 S.W.3d 744, 762 (Ky. 2005) (quoting Christopher C. Mueller [&] Laird C. Kirkpatrick, Federal Evidence § 21 (2d ed. 1994)).

On direct examination, the prosecutor asked Det. Berry whether he would automatically charge someone with murder because he had killed another. He said he would not because there may be potential explanations and extenuating circumstances, such as self-defense, to explore. Det. Berry was then asked whether he would charge someone if he believed no crime had occurred at all. He again responded he would not. A few minutes later, the prosecutor confirmed with Det. Berry, after canvassing all available witnesses, he chose to prefer a murder charge against Hargroves in Williams' death. Based on this limited questioning—covering less than two minutes in four days of guilt phase testimony—Hargroves argues palpable error mandates reversal. We disagree.

First, we do not perceive Det. Berry's responses to the prosecutor to express an opinion on Hargroves' guilt. When police arrived on scene, Williams identified Hargroves as the man who shot him. Furthermore, when talking to police, Hargroves admitted shooting Williams who died from multiple gunshot

14

wounds to the torso. Neither the cause of death nor the shooter's identity was in doubt. The only question was Hargroves' culpability.

During opening statement, defense counsel told jurors Williams grabbed Hargroves by the throat, lifted him off the floor, and squeezed his neck so hard Hargroves could not breathe, prompting Hargroves to shoot Williams. Defense counsel concluded her opening statement by saying, at the end of trial, "we're not going to ask you *if* Tim Hargroves shot Bernard Williams, what we're going to ask you, is *why*?" Defense counsel's opening remarks primed jurors to determine whether Hargroves acted in self-defense to stop Williams from choking him. By arguing self-defense—as well as EED and voluntary intoxication—in an attempt to negate or reduce the murder charge, Hargroves made the charging decision relevant. Because Det. Berry's decision to charge Hargroves with murder was placed in issue by the defense, it was properly explored on direct examination. *See Brewer*, 206 S.W.3d at 352.

Second, as the Commonwealth argues, Det. Berry's testimony about the murder charge was cumulative of the indictment the trial court read to jurors prior to voir dire. Jurors learned nothing new or different about the murder charge from Det. Berry they had not previously learned from the trial court's reading of the indictment, followed by his warning it was not evidence to be used against Hargroves. *Id.*

Third, less than two minutes of a multi-day trial was devoted to this topic. Any error was harmless and did not rise to the level of palpable error affecting Hargroves' substantial rights and causing manifest injustice. *Martin,*

15

409 S.W.3d at 344. If any error occurred, at most it was "ordinary," and did not mandate reversal.

### III. Reenactment

Hargroves' third complaint is the prosecutor improperly reenacted his theory of the shooting during the direct examination of Dr. William Ralston, the medical examiner. Upon close inspection, the true gist of trial counsel's third objection—the one pursued on appeal—was not that a reenactment occurred, but that Dr. Ralston was asked questions outside his expertise.

We begin by noting a demonstration may properly occur during the presentation of evidence while it is subject to exploration on cross-examination. *Robinson v. Kathryn*, 23 Ill.App.2d 5, 8 (1959). A demonstration during closing argument, however, which involves the actual victim and offers no opportunity for cross-examination, has been deemed improper. *Price v. Commonwealth*, 59 S.W.3d 878, 881 (Ky. 2001). Still, no mistrial was required in *Price* because the trial court's admonition to disregard the reenactment cured any error. We further note it is not uncommon for a medical examiner to testify about bullet trajectory which was the basis of the Commonwealth's questions. *Daniel v. Commonwealth*, 607 S.W.3d 626, 631 (Ky. 2020); *McQueen v. Commonwealth*, 339 S.W.3d 441, 446 (Ky. 2011). We review a trial court's evidentiary rulings for abuse of discretion. *Mason v. Commonwealth*, 559 S.W.3d 337, 339 (Ky. 2018).

Dr. Ralston identified four bullet pathways riddling Williams' body. He indicated the bullets traveled right to left. He, and the jury, watched two back-

to-back demonstrations during his testimony. Both occurred out of camera range, with the prosecutor representing the apartment occupant/victim (Williams) and Det. Berry[3] representing a visitor approaching the apartment (Hargroves).

The first demonstration, which drew no objection, focused on whether Williams' injuries were consistent with a person inside the apartment opening the exterior door, and a visitor standing outside the apartment door producing and firing a gun into the apartment. Dr. Ralston agreed the proposed scenario could produce wounds consistent with those suffered by Williams.

The prosecutor then asked, if the apartment occupant and visitor were in closer proximity, with the occupant choking the visitor, and the visitor produced a gun and fired—as the defense maintained—would those bullets have likely traveled from the occupant's right side to his left? At that point, defense counsel objected, arguing the prosecutor was smaller than Williams and the disparity in sizes rendered the demonstration useless. The prosecutor responded he was referencing "trajectory" and would apprise jurors he and Det. Berry were not to scale. The trial court overruled the objection, noting it was just a demonstration, the question and answer had to be within Dr. Ralston's scope of knowledge, the trajectory of entry and exit wounds is often shown at trial, the prosecutor must clarify he and Det. Berry were out of scale to

_____

[3] Appellate counsel says the demonstration was performed by the prosecutor and Dr. Ralston. It appears the prosecutor and Det. Berry were the true participants, although Dr. Ralston briefly exited the witness box for better viewing.

17

Williams and Hargroves, and, the demonstration was subject to attack on cross-examination.

Testimony resumed with the prosecutor apprising jurors neither he nor Det. Berry was the same size as Williams or Hargroves. The Commonwealth then asked Dr. Ralston whether, if Williams had been choking someone and lifting him off the ground, and that person produced and fired a gun, would the bullets have travelled from Williams' right to his left. Dr. Ralston responded, "Correct." The prosecutor followed up by asking the witness if he could envision a scenario in which someone shooting with his right hand could produce a wound matching the trajectory of the bullet wounds he found on Williams' body. Dr. Ralston responded, "Well, the right hand would obviously have to move to your right side of the body which would mean—right."

Defense counsel objected again, saying Dr. Ralston had testified to a special set of knowledge as a medical examiner, but was now getting into "rank speculation" about how the shooting occurred based on proposed trajectories and counsel doubted the current questions were within his scope of expertise. The Commonwealth argued Dr. Ralston had performed the autopsy, had personally examined Williams' body, and had plotted the trajectory of the bullets making his testimony proper. The trial court found Dr. Ralston qualified to express opinions on projectile trajectory and deemed his testimony proper. The court went on to say the path of a bullet fired by a right-handed person, as Hargroves appeared to be, would be common knowledge to most

18

people and overruled the objection. The Commonwealth, having completed its direct exam, passed Dr. Ralston to the defense for cross-examination.

As noted at the outset of this argument, reenactments during trial are not forbidden. When offered during a party's case-in-chief, and therefore, subject to cross-examination, as in both *Robinson* and this case, they may be helpful. Moreover, medical examiners often testify about bullet trajectory. *See Daniel,* 607 S.W.3d at 641. We discern no abuse of discretion by the trial court. *Mason,* 559 S.W.3d at 339.

### IV. Continuing Efficacy of *Miranda* Warning

Lastly, Hargroves claims he should have received a second *Miranda* warning between being interviewed by Det. Berry at the police station and Officer Rossell engaging with him while driving him to the jail a couple of hours later. Importantly, Hargroves has *not* alleged he did not receive *Miranda* rights before speaking to Det. Berry; did not knowingly, intelligently and voluntarily waive those rights; did not freely choose to speak to Det. Berry and later to Officer Rossell; nor, that he requested but was denied, an attorney. His sole argument is a reasonable person would have "assumed" the interview ended when he left the interview room even though he remained handcuffed within the police department, and anything he said in the nearly thirty-minute car ride to the jail could not be used at trial because he was not readvised of his *Miranda* rights. Officer Rossell's bodycam captured the challenged conversation, portions of which were played for the jury following the trial court's denial of a mid-trial suppression motion.

19

"When reviewing a trial court's denial of a motion to suppress, we utilize a clear error standard of review for factual findings and a de novo standard of review for conclusions of law." *Sykes v. Commonwealth*, 453 S.W.3d 722, 724 (Ky. 2015) (quoting *Jackson v. Commonwealth*, 187 S.W.3d 300, 305 (Ky. 2006)). We begin our review with the timeline of events provided by the trial court. On November 1, 2017, Hargroves was apprehended in a field behind the apartment complex where the shooting occurred. He was handcuffed by Officer Rossell at 11:00 p.m. and taken to the Radcliff Police Department where he submitted to a gunshot residue test. Without dispute, he entered the interview room inside the police department at 11:23 p.m. and a uniformed officer read him *Miranda* rights at 11:43 p.m. After speaking to Det. Berry for about two hours, Hargroves left the interview room at 1:17 a.m. and took a seat on a bench in the squad room outside the interview room. He was shoeless, his hands were cuffed behind his back and he wore a police-issued jumpsuit.

At 1:53 a.m., still sitting on the bench in the squad room, Hargroves spontaneously began speaking, telling officers he now recalled shooting Williams because Williams had choked him with such force he could barely breathe and a chain he was wearing around his neck was broken. Officer Padilla activated his bodycam and recorded the conversation. At 2:02 a.m., Officer Rossell entered the squad room and announced he would be transporting Hargroves to the Hardin County Detention Center. Five minutes later, at 2:07 a.m., Officer Rossell escorted Hargroves to the police cruiser, and at 2:35 a.m., they arrived in the detention center sally port. Hargroves moved

20

from the police department interview room to the adjacent squad room to the police car to the jail. He challenges only the conversation between the police station and the jail.

At trial, defense counsel admitted there is no consensus as to when a *Miranda* warning becomes stale and a new warning is required. The defense sought suppression only because a lay person would "assume" an interview ends upon leaving the room in which it occurs. In an attempt to distinguish Hargroves' conversations, trial counsel argued: they involved different officers (Det. Berry and Officer Rossell); they occurred in different locations (the interview room and a moving vehicle); and, they covered different topics (Officer Rossell asked Hargroves about his television viewing habits).[4] Finally, once inside the car, Hargroves was not asked if he recalled his *Miranda* rights.

Opposing suppression, the Commonwealth noted Hargroves was not forced to speak to Officer Rossell but freely chose to do so; Hargroves never invoked his rights; he never requested an attorney; he initiated many voluntary statements; and, bodycam footage showed Officer Rossell entering the squad room and announcing he was ready to transport Hargroves to the detention center before placing Hargroves in the police cruiser. Based on these facts, the Commonwealth argued there was no "break" between Det. Berry's conversation with him in the interview room, the squad room conversation captured on

---

[4] Det. Berry's actual interview is not in the record. We do not know its scope but from his testimony, it appears to have focused on the shooting of Williams and Dixon in the company of the child.

21

Officer Padilla's bodycam, and Officer Rossell's conversation with Hargroves as he sat in the back of the police cruiser still handcuffed. But for learning the items taken from him were being taken into evidence, Hargroves' circumstances between the police department and the jail did not change, and the entire time he was asked about a single set of charges.

Relying on *State v. Chew*, 150 N.J. 30, 65, 695 A.2d 1301, 1319 (1997), the trial court considered the totality of the circumstances, specifically: conditions and length of detention and interrogation; whether *Miranda* rights were given; and, the accused's age and schooling. Noting absence of a bright line rule governing when a *Miranda* warning goes stale, the trial court specifically found Hargroves was not a young man; was of above-average intelligence; and for a total of about two-and-one-half hours was questioned about a single criminal event during a continuing inquiry with no lengthy gaps. The trial court distinguished Hargroves' case from one in which different crimes are investigated and there is a substantial break in time.

The trial court mentioned two other major factors—Hargroves' prior experience with both law enforcement and the judicial system. The shooting of Williams and Dixon was Hargroves' second or third arrest in 2017; he had previously been inside the Radcliff Police Department; and, he was familiar with many of its officers. Also, at the time of the shooting, he was on pretrial release for fleeing and evading, he had multiple prior misdemeanors, and, since 2005 had amassed a lengthy criminal history. Additionally, the Radcliff Police Department was a common denominator in all discussions with Hargroves. It

22

was the site of Det. Berry's interview with Hargroves; as well as the location of Hargroves' spontaneous revelations captured on Officer Padilla's bodycam; and, the starting point of the drive to the jail and Officer Rossell's conversation.

Moreover, the crimes were investigated by multiple uniformed officers familiar to Hargroves and performing multiple tasks. For example, Officer Rossell handcuffed Hargroves in the field when he was apprehended at 11:00 p.m. and then transported him to the detention center at 2:07 a.m. just three hours later. In reviewing the recording of the drive to the detention center, the trial court observed Officer Rossell asked some questions, but there were also periods of silence, and at times, Hargroves voluntarily initiated topics. Describing the ride as a "friendly, noncoercive conversation," the trial court concluded nothing coercive happened and no *Miranda* violation occurred during the drive.

We also note Hargroves had a goal in chatting with Officer Rossell during the drive. He was developing his self-defense theory and hoped examination of his neck might reveal valuable proof for his case—specifically, evidence of Williams having choked him and broken his chain. Based on the conversation during transport, upon arrival at the jail Officer Rossell and a nurse checked his neck for evidence of choking but found nothing.

We reject Hargroves' premise that the *Miranda* warning he received soon after arriving at the police department lost its efficacy when he was transported to the jail in a police cruiser driven by the same uniformed officer who had apprehended him in the field. Hargroves knowingly chose to converse with

23

Officer Rossell.  The trial court properly applied the law in denying the motion to suppress.  We discern no error in the trial court's conclusions of law.

## CONCLUSION

For the reasons expressed, we affirm the Hardin Circuit Court.

All sitting.  All concur.

COUNSEL FOR APPELLANT:

Brandon Neil Jewell
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Micah Brandon Roberts
Assistant Attorney General