**Ronald KING, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee**

**2015-SC-000386-MR**

Supreme Court of Kentucky.

MARCH 23, 2017

COUNSEL FOR APPELLANT: Roy Alyette Durham II, Assistant Public Advocacy.

COUNSEL FOR APPELLEE: Andy Beshear, Attorney General, James Daryl Havey, Assistant Attorney General.

OPINION OF THE COURT BY JUSTICE WRIGHT

Appellant, Ronald Lee King, was convicted of second-degree assault for shooting his stepson in the arm, fourth-degree assault for injuring his wife, first-degree wanton endangerment for threatening his wife with a gun, and third-degree arson for starting a fire inside his trailer. His primary claim on appeal is that the trial court erred in refusing to instruct the jury on voluntary intoxication under KRS 501.080(1). This Court agrees that the evidence was sufficient to entitle him to such an instruction. But because voluntary intoxication provides only a partial defense as explained below, the failure to include the instruction was reversible error only as to the second-degree assault conviction. We affirm the remaining convictions and sentences.

## I. BACKGROUND

Ronald Lee King lived in a trailer with his wife of 32 years, Hope; her son, David, and his fiancée, Rachel; Hope's sister; and Hope's two minor grandchildren. He took prescribed doses of Prozac, Lortab, and arthritis medicine on a daily basis. According to his wife, he did so on the day in question.

On that day in May 2014, David purchased a 1.75 liter bottle (a so-called handle) of bourbon. King, David, and Rachel each had a few mixed drinks over the course of two to three hours that afternoon. Afterward, David stowed the more-than-half-full bottle in the freezer, as was his custom.

In the hours that followed, however, as the trailer's various residents retired to their own devices (watching movies, falling asleep, etc.), King apparently finished off the rest of the bourbon by himself. (Although the Commonwealth argued at trial that there was no evidence of this, as King did not testify, there was also no evidence that anyone but he continued drinking after the trio's shared drinks that afternoon.)

At some point later in the evening, Rachel left the room she shared with David and encountered King with a drink in his hand. She testified that he was coherent and intelligible at that time, although he informed her that the bourbon was almost gone. They talked briefly about family pictures. In the meantime, Hope had gone to bed because she had to be up early the next morning. In spite of that, King repeatedly disturbed her by coming into their bedroom and turning on the lights to roll cigarettes. When she eventually asked him to stop so that she could sleep, an argument ensued and King became belligerent. He called her derogatory names and threatened her with a gun held against her head. He also somehow injured her arm, but not seriously. Hope testified that he appeared to have drunk too much and had a "blank look on his face like he wasn't there."

Rachel overheard the commotion and became worried. After hearing King threaten to kill Hope, she roused David. When he heard his mother say something about a gun, he entered the bedroom to investigate. He saw King holding his mother down on their bed with a gun to her head, so he grabbed King's shoulder and pulled him off his mother.

After David did so, King cried, "I'll shoot you," before making good on the threat and shooting David in the left forearm. The gunshot wound, it seems, also was not serious.

King then apparently just sat on a chair in his bedroom while the others fled the trailer and called 911. Rachel reentered the trailer a few times to retrieve various items. On one of those reentries, she observed King standing by his bed, appearing to count pills.

Police soon arrived and surrounded the home. They did not immediately enter because they knew the suspect inside was armed. A short time later, an alarm sounded and they observed smoke and fire coming from the trailer. The smoke choked officers and impeded their entry into the trailer. One officer entered briefly on his stomach to avoid the smoke, however, and noted a pile of clothes engulfed in flames at the end of a hallway.

In the meantime, King barricaded himself in the bathroom at the back of the trailer. He attempted to exit out of the bathroom window but got stuck. Police outside found him dangling from the window and pulled him down.

Once on the ground, he was initially unresponsive and appeared to be unconscious and intoxicated. One officer noted in his report that he suspected a drug or alcohol overdose. King had sustained minor cuts, scrapes, and burns.

Police handcuffed King, carried him away from the trailer, and laid him on the grass, where he vomited a few times. He then became combative and remained so. Emergency medical responders arrived, and because of his unruliness, police handcuffed him to his gurney for the trip to the hospital. Crime scene investigators later found the empty bourbon bottle on King's bedroom floor, along with three prescription pill bottles, all also empty save for one pill. They also found a semi-automatic handgun on the bedroom floor and an unloaded revolver next to the toilet in the barricaded bathroom. There was fire and smoke damage throughout the trailer, but they found no evidence that an accelerant was used. Nor did they find any evidence of an accidental source of the fire, such as the dryer or other heat source. Two cigarette lighters were found, one in King's bedroom accompanying his cigarettes and another inside the dresser that he used to barricade the bathroom door.

A few days after his arrest, King told police that he remembered taking the rest of his pills in a suicide attempt. He did not testify at trial. Hope, David, and Rachel all testified that they had never before seen King act as he did that evening—that he had never in any way been violent, aggressive, or threatening, with a gun or otherwise. David knew of no prior argument between his mother and stepfather having become physical. Nor could he recall even the last time they argued at all.

King was charged with first-degree arson, first-degree wanton endangerment of Hope for holding a gun to her head, second-degree assault for shooting David in the arm, and fourth-degree assault for injuring his wife's arm. His defense at trial was voluntary intoxication, i.e., that his state of drunkenness negated his capacity to form the criminal intent necessary for conviction. *See* KRS 501.080. Although the

trial court instructed the jury on the lesser-included offenses of second- and third-degree arson and fourth-degree assault of David, it rejected his request for an explicit jury instruction on voluntary intoxication.

The jury convicted King of third-degree arson, second-degree assault of David, first-degree wanton endangerment of Hope, and fourth-degree assault of Hope. They recommended consecutive prison sentences for the first three convictions of five years, ten years, and five years, respectively, along with a concurrent 12-month prison sentence for the fourth-degree assault conviction. The trial court sentenced him to the recommended total of 20 years in prison. King now appeals to this Court as a matter of right. *See* Ky. Const. § 110(2)(b).

## II. ANALYSIS

**A. The evidence of King's intoxication was sufficient to entitle him to a jury instruction on voluntary intoxication as a defense under KRS 501.080(1).**

We begin by addressing King's contention that the trial court erred by refusing to instruct the jury on voluntary intoxication as a defense under KRS 501.080(1).

 Trial courts must instruct juries on every theory of the case that finds reasonable support in the evidence. *E.g., Manning v. Commonwealth*, 23 S.W.3d 610, 614 (Ky. 2000). This "requires instructions applicable to every state of [the] case covered by the indictment and deducible from or supported to any extent by the testimony." *Lee v. Commonwealth*, 329 S.W.2d 57, 60 (Ky. 1959). This applies to affirmative defenses, such as intoxication, as well as lesser-included offenses. "A defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury on proper instructions." *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky. 1999).

The Penal Code makes voluntary intoxication a defense "only if such condition . . . [n]egatives the existence of an element of the offense." KRS 501.080(1).[1] Here, the element subject to negation by intoxication is criminal intent—that is, "intoxication that negates an individual's capacity to form a culpable mental state essential to the commission of the offense." KRS 501.080 Ky. Crime Comm'n/LRC Cmt. (1974).

 "An accused is always entitled to have this defense submitted to the jury if his evidence is sufficient to indicate the degree of intoxication required . . . to prevent his forming an intent to commit" the crime charged. *Parido v. Commonwealth*, 547 S.W.2d 125, 128 (Ky. 1977). This requires "evidence reasonably sufficient to prove that the defendant was so drunk that he did not know what he was doing." *Meadows v. Commonwealth*, 550 S.W.2d 511, 513 (Ky. 1977). Evidence of "mere drunkenness" will not suffice. *Jewell v. Commonwealth*, 549 S.W.2d 807, 812 (Ky. 1977), *overruled on other grounds by Payne v. Commonwealth*, 623 S.W.2d 867, 870 (Ky. 1981).

 Turning to the case at bar, we agree with King that the evidence was sufficient to require a voluntary-intoxication instruction.

---

1. Although not at issue in this case, we note that the Penal Code treats *involuntary intoxication* differently. *See* KRS 501.080(2) (providing that intoxication is also a defense if it "is not voluntarily produced and deprives the defendant of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law").

There is no dispute that David purchased and opened a large bottle (a so-called "handle," or 1.75 liters) of bourbon on the day in question. He shared that bottle with his fiancée and King. And while the testimony differs slightly, it suffices to say that each consumed three or fewer mixed drinks over the course of two to three hours that afternoon. When they ceased their communal drinking, David stored the bottle in the freezer, as was his custom. At that time, it remained more than half full. There is no dispute that the remainder of the bottle was emptied. And there is no evidence that anyone but King kept drinking after David stored the bourbon in the freezer.

At some point later in the evening, Rachel had a conversation with King about family photographs. According to Rachel, he was coherent and not visibly intoxicated. She did observe a drink in his hand, however, and he remarked that the bourbon was almost gone.

Then, a few hours later, King became belligerent and physically aggressive. This, of course, culminated in his pointing a gun at his wife's head and injuring her arm, threatening and shooting David in the arm, setting a fire inside the trailer, and barricading himself in the bathroom before finally trying and failing to escape through the bathroom window.

All three witnesses (and victims) of his abhorrent behavior agreed that King appeared to be very drunk and acting in a manner inconsistent with his character. None of them had ever seen him behave in such a manner, nor had they ever observed him to be physically violent or verbally abusive in any way. Furthermore, King was unresponsive and appeared to be unconscious when police pulled him from the bathroom window. The police report documented that he appeared to be intoxicated and possibly overdosed on drugs or alcohol. A short time later, he vomited several times in the grass and, thereafter, remained belligerent and uncooperative with police and medical personal. The judge also heard about some evidence of King's blood alcohol content at the hospital being somewhere in the vicinity of .266 (more on this in Part II.C below).

This is sufficient evidence to support putting before the factfinder the question whether King was sufficiently inebriated to satisfy KRS 501.080(1). The requirement of introducing "some evidence justifying a reasonable inference of the existence of a defense," *Grimes v. McAnulty*, 957 S.W.2d 223, 226 (Ky. 1997), is not a terribly high bar. The evidence easily reached it here.

Our case law supports this conclusion. *See, e.g., Nichols v. Commonwealth*, 142 S.W.3d 683, 688-89 (Ky. 2004) (instruction was required where there was evidence that defendant had consumed as much as a pint and a half of vodka and seven beers; told police he was "f—ked up"; and was perceived by witnesses as intoxicated and described as out of control and "acting wild, like he was drunk or something"); *Rogers v. Commonwealth*, 86 S.W.3d 29, 44 (Ky. 2002) (holding evidence that diminutive defendant consumed 12 beers; described himself as "real drunk"; and demonstrated uncertainty as to details of people, places, and objects involved in crimes; was sufficient to support instruction); *Brown v. Commonwealth*, 575 S.W.2d 451, 452 & n.1 (Ky. 1978) (requiring instruction where arresting officer described defendant as "pretty drunk"; Sheriff observed that he "was thick tongued, he repeated himself a right smart and was kinda wayward in his walk"; several witnesses confirmed that he was drunk and had been drinking nonstop for over a day; his BAC was .29 three hours afterwards; and he claimed not to recall anything about the shooting); *Jew-*

*ell*, 549 S.W.2d at 814 (holding there was enough evidence to call for an instruction, even in spite of the defendant's own insistence that he was not drunk, where he had a BAC of .11 several hours after the crime; eye witnesses at the scene described him as being drunk; and he was adamant about having no recollection about the occurrence), *overruled on other grounds by Payne*, 623 S.W.2d 867; *Parido*, 547 S.W.2d at 128 (concluding defendant's testimony, which, amounted to "a gap of total darkness" in his recollection of the events surrounding the crime, supported giving an instruction).

Finally, we reject the Commonwealth's argument against the sufficiency of the evidence, supplying a counter-narrative of the evidence and how it should be viewed and interpreted. The Commonwealth disputes what inferences should be drawn from the evidence. It does not dispute what the proof was.

This is flawed in two respects. One, it overemphasizes certain aspects of the evidence that it identifies as cutting against King's defense. At the same time, it ignores some of the proof supporting the defense and attempts to diminish much of the rest. In this way, the Commonwealth's position relies on weighing the evidence and assessing credibility, which are of course fact-finding functions reserved to the jury. *E.g., Commonwealth v. Smith*, 5 S.W.3d 126, 129 (Ky. 1999).

When there is proof to support a raised defense, it is the jury's prerogative, not the court's or Commonwealth's, to consider all of the evidence and decide whether to accept or reject it. "[N]o matter how preposterous, any defense which is supported by the evidence must be submitted to the jury. 'It is the privilege of the jury to believe the unbelievable if the jury so wishes.'" *Taylor*, 995 S.W.2d at 361 (quot-

ing *Mishler v. Commonwealth*, 556 S.W.2d 676, 680 (Ky. 1977)).

To conclude, because there was evidence for the jury to reasonably have believed that King's intoxication inhibited his capacity to form the necessary intent to commit (some of) the charged crimes, the trial court erred in refusing to instruct the jury on voluntary intoxication under KRS 501.080(1).

**B. The failure to instruct the jury on voluntary intoxication is reversible error only as to the second-degree assault conviction.**

That King was entitled to a voluntary-intoxication jury instruction does not end our inquiry, however. This is because the General Assembly has limited the reach of the intoxication defense.

The statutory definition of *wantonly*—acting while aware of and consciously disregarding a substantial and unjustifiable risk—includes the caveat that an unaware person's act is still wanton if it is his or her being voluntarily intoxicated that causes such unawareness. KRS 501.020(3). And this Court long ago interpreted this statute to mean that "voluntary intoxication constitutes a defense only to intentional and knowing offenses and does not provide a defense" to offenses with lesser mental states, such as wantonness or recklessness. *Brown*, 575 S.W.2d at 452. Most of King's convictions are for crimes that fall in the latter category, so the trial court did not err in failing to give the instruction for those crimes.

First, as even King concedes, no instructional error occurred as to his wanton-endangerment conviction. Wanton endangerment criminalizes wanton not intentional conduct. Because voluntary intoxication does not negate wantonness, there was never a need to instruct on that defense.

Similarly, there is no error in failing to give the requested instruction as to King's conviction for fourth-degree assault of his wife. The statute defines that crime as one of two things: (a) "intentionally *or wantonly* caus[ing] physical injury to another person;" or (b) "reckless[ly] . . . caus[ing] physical injury to another person by means of a deadly weapon or a dangerous instrument." KRS 508.030(1) (emphasis added). So, when a person causes physical injury to another while being so inebriated as to satisfy KRS 501.080(1), he would still be guilty of fourth-degree assault because KRS 508.030(1)(a) criminalizes equally wanton as well as intentional conduct.

■ Next, we turn to the third-degree arson conviction, which raises a somewhat more difficult question. This more difficult question arises because the third-degree arson statute, KRS 513.040, requires acting with two distinct mental states—one pertaining to the basic physical act of starting a fire and the other to the consequences of that act.

We start with the latter. Here again, the statute does not require the offender to have intended the punishable consequences of his actions, "destruction or damage to a building." KRS 513.040(1). Instead, he will be guilty of third-degree arson if he "wantonly causes" them. Voluntary intoxication, of course, cannot negate that element.

But the other mental-state requirement causes a bit of a snag in the analysis. The statute also requires that the person act "intentionally" in the first instance when starting the fire. KRS 513.040(1).[2] Pointing out that the statute thus requires an intentional act, King insists that voluntary intoxication can be a viable defense to third-degree arson despite KRS 513.040(1)'s requiring only wantonness as to the consequences of the act. We disagree. To understand why, it is instructive to wade slightly into the somewhat troublesome common-law distinction between specific and general intent. To be sure, the line between the two is fuzzy and eludes ready definition. But it suffices for our purposes here to mention briefly a few widely accepted, generic principles underpinning the distinction.[3]

First, *specific intent* has been defined broadly as "some intent in addition to the intent to do the physical act which the crime requires." Wayne R. LaFave, 2 *Substantive Criminal Law* § 9.5(a), 45 (2d ed. 2003). It is a person's intent to have a specific something follow or result from their act. *General intent*, on the other hand, can be understood as being the "intent to do the physical act—or, perhaps recklessly doing the physical act—which the crime requires." *Id.* Another way of understanding it comes from Black's, which defines *general intent* as "[t]he intent to perform an act even though the actor does not desire the consequences

**2.** Arson under our Penal Code also covers damage caused by explosives. *See* KRS 513.020-.040. For the sake of simplicity, our discussion refers only to the fire-starting variety of arson. The analysis, however, applies equally to "causing an explosion" arsons as well.

**3.** At common law, the basic rule turned the applicability of the voluntary-intoxication defense on this distinction, as it was generally held to negate specific- but not general-intent crimes. *See generally* Paul H. Robinson, 1

*Criminal Law Defenses* § 65(e) (discussing common-law approach to voluntary-intoxication defense). Although the common-law rule in Kentucky was replaced by the General Assembly in 1974 with the adoption of our current Penal Code and its codification of KRS 501.080, there are remnants of the common law that persist—a specific example is KRS 501.020(3)'s bar against negating wantonness. This informs our analysis of the arson statute's dual mental-state requirements.

that result." Black's Law Dictionary (10th ed. 2014). In this way, it is typically considered to encompass disregarding a known or knowable risk (i.e., wantonness or recklessness) as well as mere inadvertence (i.e., negligence).

So, for instance, assume that a man shoots another person intending to kill, and that person dies. The man would be guilty of intentional murder, which is a specific-intent crime. *See* KRS 507.020(1)(a). He acted with the specific intent that the physical act result in the other's death.

Now assume a different scenario also resulting in death: An absent-minded father takes his two-year-old daughter with him to run errands on a hot day, but forgets that the child is in the backseat. He then proceeds to stop at his local watering hole for lunch and a beverage or two among friends before returning home, where he leaves his forgotten daughter strapped into her car seat. The child tragically dies. The father did not have the specific intent to kill his daughter. But he did have the general intent to do every discreet act in this scenario. So were a jury to find that he acted wantonly with respect to his child's wellbeing, the described actions resulting in his daughter's death would constitute second-degree manslaughter. *See* KRS 507.040(1)(b). It is a general-intent crime in the sense that he did not specifically intend her death.

So we return to the question here: Does KRS 513.040(1)'s requirement of an intentional act mean that voluntary intoxication can be a defense to third-degree arson?

The answer to that question is "No." This is so because the statute criminalizes, not the basic act of starting a fire that is required to be intentional in the first instance, but rather the being wanton about the damage or destruction that fire ends up causing. This is where third-degree ar-

son differs from its first- and second-degree counterparts, which criminalize fires started with the specific intent to damage or destroy. Third-degree arson requires no such specific intent. *Compare* KRS 513.020, *and* KRS 513.030, *with* KRS 513.040.

The statute requires an intentional act only in the sense that the flames, wherever and however they are ignited, must have been lit intentionally. "[A]n *intentional act* of starting a fire" is required first and foremost. KRS 513.020 Ky. Crime Comm'n/LRC Comm. (1974). "Before conviction ... is appropriate, it must be established that the defendant consciously desired to start the fire...." *Id.* The upshot of this is that accidentally starting a fire is not a crime. So neither the bad electrician whose faulty wiring causes an office building to burn down, nor the distracted smoker whose carelessly discarded cigarette butt starts a forest fire that burns multiple residences, are criminal arsonists under our Penal Code.

These examples help to see the failings in King's argument. An accident in the fire being ignited at all is what negates the intent requirement, not an accident in what the fire ended up doing after it was lit. Whether sober or drunk, the bad electrician's and careless smoker's fires were always accidental, even if negligent.

That is entirely different than, for example, an inebriated college student following his school's big victory who, fueled by the massive volume of alcohol he drank before and during the game, makes the poor decision to celebrate by lighting on fire an old couch outside his house. The house then (wantonly) burns down. Was it only by accident that the couch-fire ended up burning down the house? Sure. But, drunk or not, the college student can hardly claim that the couch-lighting itself was an acci-

dent, which is all that the third-degree arson statute's intentional-act requirement is concerned with.

And so we are left to conclude that because third-degree arson requires only the general intent to start a fire—the reason matters not—plus wantonness as to the risks of doing so, voluntary intoxication is not a viable defense. Here, the trial court included instructions for all three degrees of arson, and the jury acquitted him of the first- and second-degree offenses and convicted him of the third-degree offense. Therefore, King's claim that the trial court erred in refusing to instruct on voluntary intoxication as to arson is moot in part and harmless in part, respectively.

■ In the end, the instructional error here calls into question only King's second-degree assault conviction. As to that conviction, our precedents leave no doubt that the failure to affirmatively instruct the jury on the voluntary-intoxication defense when there was sufficient evidence supporting it constitutes reversible error. *See Brown,* 575 S.W.2d at 452 (given there was sufficient evidence for a voluntary-intoxication defense, holding that "[i]f it is to be submitted and the mass of evidence on the subject is to have any comprehensible meaning to the jury, it must be accompanied by an instruction"); *Cf. Jewell,* 549 S.W.2d at 812 (explaining how voluntary intoxication, like other statutory defenses, requires an instruction affirmatively calling it to the jury's attention), *overruled on other grounds by Payne,* 623 S.W.2d at 870.

**C. The admissibility of the blood-analysis report should be resolved on**

**remand if King again seeks to introduce it.**

Finally, King insists that the trial court committed reversible error in excluding laboratory test results of his blood taken upon admission to the hospital after his arrest. This claimed error's relevance lies in its alleged deleterious effect on King's presentation of his voluntary-intoxication defense. We are already reversing and remanding King's second-degree assault conviction, and the blood-analysis report's admissibility is immaterial to the convictions that we are affirming for the same reasons those convictions were not subject to reversal for the instructional error discussed above. On remand, the parties will have an opportunity, and be better positioned, to clarify their arguments should King again seek to admit the lab report.

### III. CONCLUSION

Because King was entitled to have the jury instructed on voluntary intoxication as a defense under KRS 501.080(1), this Court reverses his conviction and sentence for second-degree assault. We affirm, however, his convictions and sentences for first-degree wanton endangerment, third-degree arson, and fourth-degree assault, because their required mental states cannot be negated by voluntary intoxication. We remand this matter to the Kenton Circuit Court for further proceedings consistent with this opinion.

All sitting. All concur.