# Supreme Court of Kentucky

2022-SC-0181-MR

ERIC BERRY                                        APPELLANT

               ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.              HONORABLE ANGELA MCCORMICK BISIG, JUDGE
                        NO. 18-CR-000276

COMMONWEALTH OF KENTUCKY                    APPELLEE

## ORDER CORRECTING

The Court, on its own motion, orders that the attached Opinion of the Court be substituted in lieu of the original Opinion of the Court, rendered on December 14, 2023, to correct a typographical error appearing in the vote line of the Opinion. The vote line of the Opinion is corrected to show that Justice Thompson voted to concur in result only with the Court's majority opinion. The correction does not affect the ultimate holding of the original Opinion of the Court.

ENTERED: December 18, 2023

_____
CHIEF JUSTICE

# Supreme Court of Kentucky

2022-SC-0181-MR

ERIC ANTHONY BERRY                                  APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.            HONORABLE ANGELA MCCORMICK BISIG, JUDGE
NO. 18-CR-000276

COMMONWEALTH OF KENTUCKY                    APPELLEE

**OPINION OF THE COURT BY JUSTICE CONLEY**

**<u>AFFIRMING</u>**

This case comes before the Court on appeal as a matter of right[1] by Eric Berry. Berry was convicted of first-degree burglary, first-degree sexual assault, two counts of fourth-degree assault, first-degree fleeing or evading, and resisting arrest. The jury then found Berry to be a first-degree persistent felony offender. He was sentenced to twenty-five years in prison. Berry now argues that his right to speedy trial was violated; the trial court abused its discretion in not giving an intoxication defense instruction; the trial court erred in disallowing Berry's former testimony from a domestic violence hearing, despite Berry asserting his Fifth Amendment right to not testify at his criminal trial; the trial court erred in not severing the April and December counts for separate

---

[1] Ky. Const. § 110(2)(b).

trials; improper bolstering testimony; and cumulative error. After review, we affirm the trial court.

## I.      Facts

Berry and Kimberly Alford had been in a relationship from 2012-2016. The relationship ended acrimoniously, and, upon its ending, Alford got a protective order requiring Berry have no unlawful contact with her. Alford and Berry continued to talk through text messages and emails. On April 6, 2017, Alford pulled into her driveway and Berry quickly pulled in behind her, as if he had been waiting for her to arrive. Alford testified to being intimidated by Berry and attempted to avoid a confrontation by going into her house. Berry followed behind her and entered the house though he was not invited in. Berry told Alford he was in a "bad place," and desired to stay the night at her house. Alford agreed but told Berry he could not sleep with her in her bedroom. At some point during the night, Berry went to use the restroom then entered Alford's bedroom. She was awakened by him entering the bed, lifting her shirt, and kissing her back. Alford resisted these advances verbally, then physically. After a struggle, Berry overpowered Alford, pulling down her pajamas, tearing off her underwear, and penetrating her with his fingers. Berry eventually stopped, threatened to kill Alford if he ever caught her with another man, and left the room. The next day Alford filed a domestic violence complaint, sought an amended protective order, and was examined by a Sexual Assault Nurse Examiner (SANE nurse). Alford, however, declined to formally press charges.

2

By December 2017, Alford had been in a relationship with Jonathan Bielefeld. On December 2, 2017, she, Bielefeld, and her daughter, K.K.,[2] had gone shopping for a Christmas tree. After setting up decorations that night, they all went to bed. Around 3:00 AM on December 3, 2017, Alford was awakened by loud booms caused by Berry banging and kicking on the backdoor. He eventually broke in. Alford ran to her daughter's room, telling her to call the police because her initial emergency call had failed. Alford hid in her daughter's closet. Berry stormed through the house and made his way to Alford's bedroom where Bielefeld was. He attacked Bielefeld, and demanded "where's she at?" Bielefeld responded he did not know but that she was "probably hiding from you." Enraged, Berry proceeded to repeatedly strike Bielefeld's head.

Berry next went to K.K.'s room and again demanded to know where Alford was. K.K. too responded she did not know. Berry searched various parts of the room but failed to find Alford. He then went back to Alford's room where he found Bielefeld using a t-shirt to clean the blood from his face. Berry snatched the shirt and used it to strangle Bielefeld to the point just short of unconsciousness. Berry then ceased this second attack and searched throughout the house for Alford. He eventually went back to Alford's bedroom and for the third time attacked Bielefeld. Bielefeld grabbed Berry so as to bring him closer and restrict the movements of his arms. Berry bit Bielefeld's ear.

_____

[2] We use initials to protect the identity of minor victims.

After this Berry returned to K.K.'s room, again yelling at her, "where's your mom?" He then ripped her closet door off its panel and found Alford. He immediately began to repeatedly hit her in the face, and Alford testified to believing she would be killed. Twelve-year old K.K., with no shortage of bravery, intervened but to no avail. Berry struck her too, punching her in the face. Berry renewed his attack on Alford, stripping off her pajamas and underwear. At this moment, police finally arrived with an officer banging and yelling on the front door loud enough to be heard in K.K.'s bedroom.

Berry ceased his attack and ran to the backdoor. Unbeknownst to him, another officer had entered the house through the backdoor, gun drawn. When this officer encountered Berry, he saw he was unarmed and began holstering his weapon. Berry surged forth, struck him in the head, and fled out the backdoor. Berry made for the front of the house when he encountered another officer. Again, Berry surged forth, lowering his head, and headbutting the officer. This officer managed to hold on to Berry, slowing him down, and allowing more responding officers to finally subdue him outside the house.

Berry was arraigned on January 26, 2018. Prior to trial he sought to sever the charges stemming from the April 2017 incident (sexual abuse and violation of protective order) from the December incident. The trial court denied that motion. While awaiting trial the Covid-19 pandemic occurred. After the initial orders by the Governor and this Court in March and April 2020, Berry orally moved for a speedy trial on April 30, 2020. He filed a written motion for speedy trial on June 18, 2020. Berry was released on bond on May 14, 2021.

4

On November 30, 2021, he moved to dismiss for a speedy trial violation. The trial court denied the motion finding Berry's own actions—such as a motion regarding evidence of mental defect and hiring private counsel—and the Covid-19 pandemic were principally to blame for the delay of trial. Finally, on February 8, 2022, the trial began.

We will discuss further facts below as they relate to the specific arguments before the Court. We now proceed to the merits.

## II.    Analysis

### A. No Speedy Trial Violation

We determine a violation of the right to speedy trial by looking to "(1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant caused by the delay." *Dunaway v. Commonwealth,* 60 S.W.3d 563, 569 (Ky. 2001). None of these factors are "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Stacy v. Commonwealth,* 396 S.W.3d 787, 795 (Ky. 2013) (quoting *Barker v. Wingo,* 407 U.S. 514, 533 (1972)).

As to length of delay, Berry's time of arrest to time of trial was approximately 50 months. "This Court has generally considered delays of over one year to be presumptively prejudicial." *Goncalves v. Commonwealth,* 404 S.W.3d 180, 199 (Ky. 2013). Presumptive prejudice is not a rule that holds a sufficient length of delay is enough to conclude the constitutional right has

5

been violated—"it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry." *Doggett v. United States*, 505 U.S. 647, 652n.2 (1992). In other words, if a length of delay is not presumptively prejudicial then courts need not inquire into the alleged violation whatsoever; absent a presumptively prejudicial delay there is no speedy trial violation. *Goncalves*, 404 S.W.3d at 199; *Dunaway*, 60 S.W.3d at 569.

The second factor looks to the reasons for the delay. There are three categories of reasons: "(1) a 'deliberate attempt to delay the trial in order to hamper the defense'; (2) a 'more neutral reason such as negligence or overcrowded courts'; and (3) 'a valid reason, such as a missing witness.'" *Dunaway*, 60 S.W.3d at 570 (quoting *Barker*, 407 U.S. at 531). In blunt terms, we ask "whether the government or the criminal defendant is more to blame for that delay[.]" *Doggett*, 505 U.S. at 651.

This case raises an issue of first impression in Kentucky as to how the Covid-19 pandemic should be categorized. The Commonwealth has pointed us to two cases from the federal circuits addressing this issue: *United States v. Snyder*, 71 F.4th 555 (7th Cir. 2023), and *United States v. Keith*, 61 F.4th 839 (10th Cir. 2023). The Tenth Circuit held the pandemic is "a truly neutral justification—not favoring either side." *Keith*, 61 F.4th at 853. The Seventh Circuit followed *Keith* by holding the pandemic is a "justifiable" reason for delay that "cannot fairly be attributed to the government." *Snyder*, 71 F.4th at 578. Considering this persuasive authority, we hold that generally the Covid-19 pandemic falls under the third *Barker* category of a "valid reason" for delay and

6

should not be weighed against the Commonwealth. We caution that this is not an iron rule but rather presumptive. The pandemic is a not a get-out-of-the-constitution-free card, as our decisions in *Beshear v. Acree*, 615 S.W.3d 780 (Ky. 2020), and *Cameron v. Beshear*, 628 S.W.3d 61 (Ky. 2021), make clear. It is within the realm of possibility that a case may arise where a defendant can demonstrate with evidence that the Commonwealth used the Covid-19 pandemic as a convenient excuse to not prosecute a case promptly even within the strictures imposed by the pandemic and response thereto. The evidence necessary to rebut the presumption of validity will necessarily be high and case specific. The pandemic undoubtedly frustrated the ability of the Commonwealth to investigate cases and prosecute them as promptly as they might have been under normal circumstances. But the specific inquiry would be whether the pandemic frustrated the ability of the Commonwealth to investigate cases and prosecute them as promptly as they might have been within the context of the pandemic. In other words: did the Commonwealth forego taking reasonable actions to promptly prosecute the case that it could have taken in spite of the pandemic but nonetheless claims the pandemic as a reason for not taking those reasonable actions. If reasonable actions could have been taken despite the pandemic, then obviously the pandemic cannot be a reason to have not taken said actions; therefore, the pandemic would cease to be a valid reason for delay.

In Berry's case, the first cause of delay was his own notice to the trial court that he had mental-health concerns in November 2018. Next, he filed a

motion of intent to introduce evidence of insanity, mental condition, or mental defect in April 2019. This prompted the trial court to order an evaluation by the Kentucky Correctional Psychiatric Center (KCPC). This evaluation would not be concluded until October 2019. At the October 2019 pre-trial conference, Berry stated he was not prepared for trial. At the next pre-trial conference in December 2019, Berry again argued against setting a trial date, but the trial court scheduled trial for June 2, 2020. By that time, the pandemic was in full swing. Although this Court released several Administrative Orders in response to the pandemic prior to the June 2, 2020 trial date, the first one to definitively and temporally apply to Berry's case was Administrative Order 2020-40; wherein we ordered that "effective June 1, 2020," "Jury trials shall be postponed and rescheduled for no sooner than August 1, 2020 . . . ." Thus, Berry's first trial date was unequivocally cancelled and postponed by order of this Court due to the pandemic.

On June 12, 2020, a pretrial conference was conducted telephonically. The specific public defender representing Berry told the trial court he would be leaving for a new job at the end of that month, and a new attorney had not yet been appointed to take over the case. The Commonwealth represented that he was unsure whether scheduling a new trial date at that point in time was feasible because of the pandemic. Because a new attorney was coming into the case, the trial court declined to schedule a new trial—an action we think eminently reasonable. On August 27, 2020, another hearing was conducted,

8

and trial was scheduled for January 12, 2021. At a hearing on November 19, 2020, that trial date was affirmed.

On January 6, 2021, this Court entered Administrative Order 2021-02, which postponed all jury trials until April 1, 2021. At the hearing on January 7, 2021, which had originally been intended as a final pretrial conference, a new trial date had to be determined. Defense counsel informed the trial court she would be on maternity leave for three months between April through the first week of July. The new trial date was set for August 3, 2021.

On July 26, 2021, a final pretrial conference was conducted. The Commonwealth represented it was ready for trial, but defense counsel made an oral motion to continue the trial. As defense counsel at the hearing aptly summarized, the trial dates up to that point had been postponed either because Berry had to be evaluated by KCPC given his motion regarding evidence of mental defect or condition; or due to the orders of this Court regarding the pandemic. At the July 26 pretrial conference, defense counsel stated that she and Berry were not prepared for trial because they had never been able to sit down "face-to-face" and go over the evidence, due to pandemic protocols and her maternity leave. Secondly, she stated that since Berry had posted bond in May 2021, and found work, he now intended to hire private counsel. She also represented that Berry had always desired private counsel but due to being incarcerated could not financially afford it. The Commonwealth objected to the continuance, but the trial court reluctantly granted the motion after asking Berry directly if he sincerely intended to hire

9

private counsel. A new hearing date was set for August 30, 2021. The trial court told Berry that a new, firm trial date would be set that day and he would need to have his new counsel present. The next hearing was in fact conducted on September 2, 2021, but trial was scheduled February 8, 2022.

After this thorough review of the chronology of events, we conclude the delays for this trial were due to valid reasons. The first trial date was postponed after Berry gave notice of his intent to introduce evidence of mental illness or defect, and the Commonwealth was entitled to seek a psychiatric evaluation. The next two postponements were due to the pandemic orders of this Court. There has been no suggestion, much less proof, that the Commonwealth used these orders as a guise to otherwise delay trial. In fact, the Commonwealth had been prepared to go to trial since December of 2019. The fourth postponement was due to Berry's own motion so that he could retain private counsel.

As to the third factor, Berry first asserted his right to speedy trial on April 30, 2020. "The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531-32. But

> how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences.

*Id.* at 531. An important aspect of the assertion of the right is to put the trial court on notice so that it may "exercise a judicial discretion based on the circumstances" of the case. *Id.* at 528-29. As discussed in the chronological

10

account, the circumstances of the delays did not allow for the trial court to remedy what was irremediable. Berry did not assert his right until after the pandemic had begun. By that time the trial court's docket as to jury trials was to a significant degree controlled by this Court's administrative orders. Additionally, the specific counsel Berry was assigned also had personal issues—a new job for the first and maternity leave for the second—that necessitated tolerating delay. Finally, the third delay after assertion of the right was because of Berry's own desire to hire private counsel. Given these circumstances, we fail to see what more the trial court could have done to effectuate a speedier trial.

> Finally, there is the fourth factor of prejudice.

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.

*Id.* at 532. Claims of oppressive incarceration require "proof of trauma." *Goncalves*, 404 S.W.3d at 202. Anxiety and concern require proof "beyond that which accompanies an ordinary prosecution." *Henderson v. Commonwealth*, 563 S.W.3d 651, 665 (Ky. 2018).

Berry has not shown any "proof of trauma" resulting from his incarceration between December 2017 and May 2021, when he posted bond, or demonstrated anxiety beyond that which is normal. Though his length of incarceration is significant, we cannot share the Supreme Court's former understanding that time in jail is "simply dead time," that offers "little or no

11

recreational or rehabilitative programs." *Barker,* 407 U.S. at 532-33. The record here demonstrates that Berry did use his time in jail productively and to his betterment. He completed a substance abuse rehabilitation program called Enough is Enough. Berry even became a "mentor" in the program to other inmates after he had completed it, being described as the "leader in the group," who "went beyond his duties" in helping other inmates. He also completed a Moral Reconation Program, which focuses on cognitive behavior and moral reasoning. He completed Goodwill Industries of Kentucky's Soft Skills Academy and obtained a Ready to Work certificate thus, presumably, did do some work for Goodwill. He also completed other rehabilitation programs under Living Free of Kentucky such as the Life-plan of Recovery and Living Free Plan & Five Components of Recovery. Finally, Berry has not shown how his defense was impaired by the delay. He could have readily demonstrated this by pointing to any evidence which may have been lost in the time between arrest and trial or by cross-examining witnesses as to failures of memory. Nothing of the sort has been cited to in the record.

We conclude that although a presumptively prejudicial delay occurred in this case, no actual prejudice meriting reversal has been shown. The delays here were a perfect storm of valid reasons; namely, Berry's own motion practice and trial strategy, a pandemic, and personal reasons of Berry's first two attorneys. There was no violation of the right to speedy trial.

**B. Insufficient Evidence for Voluntary Intoxication Instruction**

Berry sought and was denied a voluntary intoxication instruction. A trial court's refusal to give an instruction is reviewed for an abuse of discretion. *Brafman v. Commonwealth*, 612 S.W.3d 850, 857 (Ky. 2020). Voluntary intoxication is an affirmative defense. *Luna v. Commonwealth*, 460 S.W.3d 851, 882 (Ky. 2015). Therefore, Berry had the burden of proof to adduce "some evidence justifying a reasonable inference of the existence of a defense[.]" *Id.* (quoting *Fredline v. Commonwealth*, 241 S.W.3d 793, 798 (Ky. 2007)). Voluntary intoxication is only a legitimate affirmative defense when it "negatives the existence of an element of the offense," KRS 501.080(1); namely, intent. Counsel conceded at oral argument that voluntary intoxication is only a defense to the first-degree burglary conviction in this case.

To merit an intoxication instruction, "[s]imple drunkenness is not sufficient[.]" *Luna*, 460 S.W.3d at 882. The "evidence [must be] reasonably sufficient to prove that the defendant was so drunk that he did not know what he was doing." *Id.* (quoting *Harris v. Commonwealth*, 313 S.W.3d 40, 50 (Ky. 2010)). At trial, all three victims testified that Berry was drunk, perhaps even exceedingly drunk. Bielefeld testified he informed a nurse at the hospital the night of the attack that he believed Berry was intoxicated. On cross-examination, Alford testified she had never seen Berry in such a state, and this was principally within the context of his drunkenness. But defense counsel specifically asked, "What caused you to believe that he had an altered mindset?" She responded, "The rage, the violence, the anger, the jealousy." When asked if she believed alcohol or substance abuse affected that, she

13

responded that she was not a doctor. At best, this specific testimony is ambiguous as to whether Alford believed Berry was in such a state she had never seen before specifically because of him being intoxicated or rather was a confluence of intoxication and his own emotions toward Alford. K.K. also testified that Berry did not appear to know what he was doing that night. Twice she stated "no," in response to this question. But immediately following that, the Commonwealth asked,

> Commonwealth: Who was he looking for that night?
>
> K.K.: My mom.
>
> CW: And he went through several rooms looking for her, right?
>
> K.K.: Yes.
>
> CW: Did it appear that that's why he was at the house?
>
> K.K: Yes.
>
> CW: To look for your mother?
>
> K.K.: Yes.

We believe the evidence was reasonably sufficient to justify an inference that Berry was intoxicated. But whether his intoxication was so excessive that he could not form the intent to commit a crime in the context of first-degree burglary is the precise question before us.

> First-degree burglary occurs
>
> when, with the intent to commit a crime, he or she knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or she or another participant in the crime . . . Causes physical injury to any person who is not a participant in the crime[.]

14

KRS 511.020(1)(b). Circumstantial evidence can support a conviction. *Pollini v. Commonwealth*, 172 S.W.3d 418, 432 (Ky. 2005) (applying rule to first-degree burglary conviction). And a jury can infer intent from the conduct of the defendant. *Ratliff v. Commonwealth*, 194 S.W.3d 258, 275 (Ky. 2006). Just as all three victims testified to the intoxication of Berry, all three also testified to Berry's conduct that demonstrates he was acting with an intent to find Alford. Bielefeld testified when Berry entered Alford's bedroom he demanded to know where she was. He specifically stated that Berry appeared to know what he was doing, that being "looking for Kim." K.K. testified when Berry entered her bedroom he demanded to know where Alford was and searched her bedroom. The testimony also demonstrated Berry searched throughout the house for Alford, and once again returned to K.K.'s bedroom where he finally found Alford in the closet. Immediately upon finding her, he assaulted her by striking her repeatedly in the face. Add to this Alford's testimony about the April incident that Berry had threatened to kill her if he knew she was with another man. All this supports the conclusion that Berry unlawfully entered Alford's home with the intent to assault her. The evidence also overwhelmingly demonstrates that while he was unlawfully in Alford's home looking for her, he caused physical injury to Bielefeld and Alford. Thus, all elements for first-degree burglary are satisfied.

The trial court, in its discretion, might have given a voluntary intoxication instruction on this evidence. But our inquiry is whether the refusal

15

to give the instruction was an abuse of discretion. As just explained, Berry was clearly searching for Alford and when he found her, he assaulted her. The jury could reasonably infer that because he immediately assaulted Alford when he found her, that was his intent all along. It is true that K.K. testified she did not believe Berry knew what he was doing. But as our review of her testimony confirms, she immediately qualified that statement by testifying Berry was searching for her mother. The overall context of her testimony also establishes that Berry was making a concerted effort to find Alford.

As the dissent correctly states, it is the duty of the trial court to examine the *sufficiency* of the evidence when deciding whether to give a voluntary intoxication instruction. Here, the trial court determined that the evidence was insufficient; and, as discussed above and below, Berry clearly was aware of what he was doing, and acted deliberately. It cannot be said that the trial court's decision was clearly erroneous, or arbitrary, unsound, and an abuse of discretion.

This Court has always looked to the evidence at trial to determine whether that evidence supported an inference that the defendant did not know what he was doing as a result of intoxication; and numerous times we have affirmed trial court's refusing to give instructions where the evidence did not support that inference. *Fredeline v. Commonwealth*, 241 S.W.3d 793, 797-98 (Ky. 2007); *Harris v. Commonwealth*, 313 S.W.3d 40, 50-51 (Ky. 2010); *Luna*, 460 S.W.3d at 882-83; *Conyers v. Commonwealth*, 530 S.W.3d 413, 431-33 (Ky. 2017).

16

Indeed, in *Conyers*, we held that where the evidence showed the defendant could "drive, walk, and understand what was said to him[,]" as well as appeared to be "aware of his actions" and "functioning normally," then there is insufficient evidence for voluntary intoxication. *Conyers*, 530 S.W.3d at 432. Here, both Bielefeld and K.K. testified that Berry spoke to them and, though obviously aggressive and violent, there was conversation going on. Both testified that this conversation was regarding the whereabouts of Alford. Both testified that he searched throughout the house looking for her. Alford testified that after Berry had discovered and assaulted her, he ripped her pajama pants and underwear off and was in the process of some kind of sexual assault, when a police officer banged on the front door and announced his presence. Berry immediately ceased his attack and ran to the back of the house. Evidently, beyond dispute, Berry was aware that what he was doing was unlawful and he would be arrested by the police and attempted to escape. He was well-enough in control of his own actions that he could search throughout the house for Alford and then navigate the home when attempting to flee.

With due respect to the dissent, the burden of proof for an affirmative defense is, admittedly, "not a terribly high bar." *King v. Commonwealth*, 513 S.W.3d 919, 924 (Ky. 2017). But if the evidence in this case—which amounts to one snippet of out-of-context testimony—is enough, then there is in fact no bar at all. Upon review, we cannot hold that one, out-of-context piece of testimony satisfies Berry's burden of proof to put forth evidence reasonably sufficient to prove he did not know what he was doing as a result of intoxication to such a

17

degree that the failure to give an intoxication instruction was an abuse of discretion. The trial court believed, and the evidence more than supports, that Berry's intent was never seriously doubted. The trial court is affirmed.

### C. No Error in Disallowing Former Testimony

Berry also sought to introduce testimony he had given at a previous domestic violence hearing in rebuttal to testimony from Detective Livers regarding the April incident. KRE 804(b)(1) allows "[t]estimony given as a witness at another hearing of the same or a different proceeding . . . if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Berry was present at trial but had invoked his Fifth Amendment right to remain silent. Thus, this case does present the question, yet unanswered in Kentucky, whether a defendant seeking to introduce prior testimony of himself under KRE 804(b)(1) is unavailable for purposes of the rule when he has invoked his Fifth Amendment right. Typically, "the proposed witness' unavailability is a threshold matter . . . ." *Roark v. Commonwealth*, 641 S.W.3d 94, 95 (Ky. 2021). But we "refrain from reaching constitutional issues when other, non-constitutional grounds can be relied upon." *Baker v. Fletcher,* 204 S.W.3d 589, 597–98 (Ky. 2006). This case also presents the question of the Commonwealth's lack of presence at the DVO hearing; therefore, a plain text reading and application of KRE 804(b)(1) suffices for resolution without reaching the implications of invoking the Fifth Amendment.

18

The trial court concluded the Commonwealth did not have a similar motive and opportunity for cross-examination in a DVO hearing, as it would have in a criminal trial. This ruling was correct under KRE 804(b)(1), as there is no identity of parties between a DVO hearing and criminal trial. The Commonwealth is not a party in the former hearing. As such, the Commonwealth—the party against whom Berry proffered his DVO testimony— did not have any opportunity to cross-examine him. Additionally, the standard of proof in a DVO hearing is preponderance of the evidence that the complainant more likely than not is a victim of domestic violence. *Commonwealth v. Anderson,* 934 S.W.2d 276, 278 (Ky. 1996). Finally, Alford, in the DVO hearing, cannot be considered a predecessor in interest since that exception only applies "in a civil action or proceeding . . . ." KRE 804(b)(1). The trial court is affirmed.

## D. Joinder of April and December Incidents for Trial Not Prejudicial

Berry sought to sever the April and December charges. The trial court concluded the circumstances of the sexual abuse charge of April were similar to the attempted sexual abuse charge of December and the evidence of the April incident would be admissible under KRE 404(b) in a trial regarding the December incident. The trial court did, however, grant the motion insofar as it pertained to the charges for violating a protective order, finding it would be overly prejudicial. Joinder of multiple offenses is appropriate "if the offenses are of the same or similar character or are based on the same acts or transactions

19

connected together or constituting parts of a common scheme or plan." RCr[3] 6.18. Joinder is reviewed for an abuse of discretion. *Garrett v. Commonwealth*, 534 S.W.3d 217, 223 (Ky. 2017). "[T]o be reversible, an erroneous joinder of offenses must be accompanied by 'a showing of prejudice' to the defendant. This showing of prejudice cannot be based on mere speculation, but must be supported by the record." *Id.* (quoting *Hammond v. Commonwealth*, 366 S.W.3d 425, 429 (Ky. 2012)). There is no need to review this issue in any greater depth. The jury acquitted Berry on the December attempted sexual abuse charge. Manifestly, the evidence of the April sexual abuse, which the jury did find him guilty of, did not prejudice him in any discernable way. The failure to demonstrate actual prejudice from the record is sufficient to conclude there is no reversible error.

### E. No Improper Bolstering

This issue is unpreserved as conceded by Berry. An unpreserved error will be reviewed for palpable error. RCr 10.26. A palpable error is one of manifest injustice—it "is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006). The SANE Nurse Sheahan and Detective Livers are alleged by Berry to have improperly bolstered the testimony of Alford.

Detective Livers investigated the April sexual abuse incident. The Commonwealth asked her,

---

[3] Kentucky Rules of Criminal Procedure.

20

and as far as your investigation goes, as far as credibility, I think we touched on this already, the statement that you got from Ms. Alford, and then reviewing the SANE exams, there was some corroboration there, right?

Detective Livers responded, "Yes, correct." Nurse Sheahan twice related testimony regarding a "digital penetration sexual assault," during the April incident. The first time was simply to say that a digital penetration sexual assault was reported by Alford and that was why she was examining her. The second time was on re-direct in response to the Commonwealth's question, to wit: "And this sexual assault occurred, approximately, you documented 0400 hours the previous morning?" Nurse Sheahan responded, "Correct." That question was in the context of a colloquy regarding the lack of bleeding or other visible injury to Alford's vagina by the time the examination occurred, which was an issue raised on cross-examination. Berry argues this testimony not only improperly bolstered Alford's testimony but invaded the province of the jury by testifying to the ultimate issue.

The Commonwealth responds by citing *Dickerson v. Commonwealth*, 485 S.W.3d 310 (Ky. 2016). In that case, a wife testified about her husband's spousal abuse despite him not being charged with a crime regarding spousal abuse, which he argued on appeal only served to improperly bolster her testimony regarding the four counts of criminal abuse and one count of murder against his children. *Id.* at 320-21. Dickerson's defense was that his wife was the guilty one and that her testimony was false. *Id.* at 321. Thus, we held that contrary to his argument of improper bolstering, his wife's "truthfulness was at issue in this case from the very beginning[,]" and "was put in issue as early as

21

voir dire[.]" *Id.* We concluded therefore that the spousal abuse testimony was "rehabilitative proof that tended to rebut the direct and implied charges of fabrication leveled against Gladys from the outset as part of the defense's guilt-shifting trial strategy." *Id.*

In opening statements, defense counsel specifically attacked Alford's credibility by telling the jury,

> You're going to hear she has a long history of lying, dating back twenty years. Three times she's been convicted of lying to police, lying to get government benefits, on and on . . . What I can tell you is that what happened allegedly in April of 2017 . . . isn't true.

Review of defense counsel's cross-examination of Alford confirms that Berry did attack Alford's credibility and truthfulness, and that this was the key to his defense against the April incident: that she was simply lying about it.

The principal case Berry cites in support of his argument is *Alford v. Commonwealth*, 338 S.W.3d 240 (Ky. 2011). *Alford* addressed a trial where the police detective testified extensively to the "statements made by an alleged victim of sexual abuse to a police detective." *Id.* at 246. Berry does not cite to any portion of the record where Detective Livers simply repeated or affirmed the statements of Alford, as happened in *Alford*. *Id.* Also in *Alford*, the doctor's "testimony not only named Appellant as the perpetrator, but went on to basically repeat the allegations to which S.A. had already testified, including statements that had no relevance to medical diagnosis and treatment (identity notwithstanding)." *Id.* at 248. Berry similarly fails to cite to the record where this kind of testimony occurred with Nurse Sheahan.

We find *Alford* distinguishable because the erroneous hearsay testimony of that case is simply not the kind that occurred here. We also agree with the Commonwealth that the testimony of Nurse Sheahan and Detective Livers was not to improperly bolster Alford's testimony but was "rehabilitative proof" that, at least as the April incident was concerned, Alford was a trustworthy complainant—an issue Berry unequivocally put before the jury. There was no error.

Finally, Berry's claim for cumulative error fails since we have found no error or abuse in the other arguments presented. "Where . . . none of the errors individually raised any real question of prejudice, we have declined to hold that the absence of prejudice plus the absence of prejudice somehow adds up to prejudice." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010).

### III. Conclusion

For the aforementioned reasons, we affirm the convictions of Berry.

VanMeter, C.J.; Conley, Keller, Lambert, Nickell, and Thompson, JJ., sitting. VanMeter, C.J.; Conley, Keller, and Lambert, JJ., concur. Thompson, J., concurs in result only. Nickell, J., concurs in part and dissents in part by separate opinion. Bisig, J., not sitting.

NICKELL, J., CONCURRING IN PART, DISSENTING IN PART: I concur with much of the majority's well-reasoned opinion. However, because I believe Berry was entitled to the requested instruction on voluntary intoxication, I respectfully dissent in part as to the conviction for first-degree burglary. "When there is proof to support a raised defense, it is the jury's prerogative, not

23

the court's or Commonwealth's, to consider all of the evidence and decide whether to accept or reject it." *King v. Commonwealth*, 513 S.W.3d 919, 925 (Ky. 2017). Under this standard, the appropriate inquiry focuses not on the weight and credibility of the evidence but, rather, on the existence of sufficient evidence. The scope of the trial court's gatekeeping role should not be allowed to infringe upon the province of the jury as the sole finder of fact.

RCr 9.54(1) imposes a duty upon the trial court "to instruct the jury in writing on the law of the case[.]" The law of the case encompasses both lesser-included offenses and any available affirmative defenses. *King,* 513 S.W.3d at 923. Thus, "[t]he jury instructions must be complete and the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury on proper instructions." *Hayes v. Commonwealth*, 870 S.W.2d 786, 788 (Ky. 1993). This rule holds "true no matter how preposterous the defendant's evidence may be." 1 Cooper & Cetrulo, *Kentucky Jury Instructions* § 1.05[A] (2022). In other words, "it is the privilege of the jury to believe the unbelievable if the jury so wishes." *Mishler v. Commonwealth*, 556 S.W.2d 676, 680 (Ky. 1977).

On appellate review from the denial of a requested instruction, we must "[c]onstru[e] the evidence favorably to the proponent of the instruction. . . [and] ask whether the evidence would permit a reasonable juror to make the finding the instruction authorizes." *Allen v. Commonwealth*, 338 S.W.3d 252, 255 n.1 (Ky. 2011); *see also* 23A C.J.S. Criminal Procedure and Rights of Accused § 1832 (2023) ("In considering whether to allow a jury instruction on an

24

affirmative defense, trial courts are responsible for acting as gatekeepers and determining whether the evidence presented, considered in the light most favorable to the defendant, could establish the affirmative defense."). "The sufficiency of the evidence to [support a requested instruction] is a question of law for the courts to determine on a case-by-case basis." *Jewell v. Commonwealth*, 549 S.W.2d 807, 812 (Ky. 1977), *overruled on other grounds by Payne v. Commonwealth*, 623 S.W.2d 867 (Ky. 1981).

"A voluntary intoxication instruction is justified only when there is evidence that the defendant was so drunk that he did not know what he was doing or when the intoxication negatives the existence of an element of the offense." *Rogers v. Commonwealth*, 86 S.W.3d 29, 44 (Ky. 2002) (footnotes and internal quotation marks omitted); KRS 501.080(1). "Mere drunkenness will not raise the defense of intoxication." *Jewell*, 549 S.W.2d at 812. Instead, "[t]here must be something in the evidence reasonably sufficient to support a doubt that the defendant knew what he was doing." *Id.* This Court recently clarified the necessary quantum of proof in a voluntary intoxication case and stated, "[t]he requirement of introducing 'some evidence justifying a reasonable inference of the existence of a defense,' . . . is not a terribly high bar." *King*, 513 S.W.3d at 924 (internal citation omitted). Moreover, "it is unnecessary that the evidence authorizing the instruction be affirmatively introduced by the defendant[.]" *Cooper & Cetrulo*, at § 1.04[B].

In the present appeal, the majority candidly recognizes, "[t]he trial court, in its discretion, might have given a voluntary intoxication instruction on this

25

evidence." *Ante,* at 15. "At trial, all three victims testified that Berry was drunk, perhaps even exceedingly drunk." *Ante,* at 13. Additionally, "K.K. testified she did not believe Berry knew what he was doing." *Ante,* at 16. In my view, if the evidence of voluntary intoxication was sufficient, then a trial court is without discretion to refuse the requested instruction. *Brown v. Commonwealth,* 575 S.W.2d 451, 452 (Ky. 1978) (holding defendant is entitled to instruction upon production of sufficient evidence of voluntary intoxication). It is not the prerogative of a court to contextualize the testimony of witnesses because "the 'reasonable juror' is the operative standard, in the appellate court as well as in the trial court." *Allen,* 338 S.W.3d at 255 n.1. Similarly, "[i]t is not for us to decide" ultimate issues of fact or otherwise resolve ambiguities in the evidence. *Mishler,* 556 S.W.2d at 680. Viewing the evidence in the light most favorable to Berry, the jury was free to believe K.K.'s statement that he did not know what he was doing and disbelieve any qualifications or contradictions. *See Cross v. Clark,* 308 Ky. 18, 23, 213 S.W.2d 443, 446 (1948) ("[The jury] may believe any of the witnesses in whole or in part, and may accept the testimony of one set of witnesses to the exclusion of that of another or the testimony of one witness as against the testimony of a number of witnesses."). Berry was thus entitled to the requested instruction on this basis without regard to the countervailing evidence of his guilt.

When there is sufficient evidence to support the defense of intoxication, it is reversible error for a trial court to refuse a requested instruction. *Mishler,* 556 S.W.2d at 659. Such a refusal is not subject to harmless error analysis

26

because a defendant is entitled by right to instructions on any lawful defense supported by the evidence. *Mondie v. Commonwealth*, 158 S.W.3d 203, 209–210 (Ky. 2005); *Nichols v. Commonwealth*, 142 S.W.3d 683, 690 (Ky. 2004). It is not the role of a court to consider questions of weight or credibility once the minimal threshold of sufficiency has been satisfied. Therefore, I respectfully concur in part, dissent in part, and would reverse for a new trial on the charge of first-degree burglary.

COUNSEL FOR APPELLANT:

Robert C. Yang
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Joseph E. Beckett
Elizabeth Hedges
Assistant Attorneys General